**PRINCIPLE BUSINESS ENTERPRISES, INC., James G. Mitchell and Winalee G. Mitchell, Plaintiffs,**

v.

**The UNITED STATES, Defendant,**

and

**American Sealcut Corp., Third-Party Defendant.**

No. 457–79C.

United States Claims Court.

Feb. 21, 1985.

Robert R. Priddy, Washington, D.C., for plaintiffs. Charles E. Snee, III, Burton A. Amernick, Thomas J. Vande Sande, and Pollock, Vande Sande & Priddy, Washington, D.C., of counsel.

Joseph A. Hill, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant.

Darryl Mexic, Washington, D.C., for third-party defendant. Sughrue, Rothwell, Mion, Zinn & MacPeak, Washington, D.C., and Jack Oisher, Tarrytown, N.Y. of counsel.

## OPINION

MAYER, Judge.

This case involves reissue patent claims pertaining to a process for making disposable plastic slippers used extensively and primarily in hospitals. Also at issue is the design patent for the slippers covered by the reissue patent. The slippers have been sold under the trademark "Pillow Paws" since 1962 and have enjoyed considerable commercial success. This suit arose when plaintiffs* accused third-party defendant, American Sealcut Corp., of making convalescent patient slippers under Defense Department contracts using the process and design disclosed by the patents. Plaintiffs filed suit under 28 U.S.C. § 1498 and the case is before the court on cross-motions for summary judgment after argument.

* James G. and Winalee G. Mitchell hold the original and reissue process patents; Winalee Mitchell is patentee on the design patent. Principle Business Enterprises, Inc., holds an exclusive

### Reissue Patent

*Background*

The original process patent, United States Patent No. 3,238,079 (original patent) was issued on March 1, 1966, pursuant to plaintiffs' application filed November 13, 1962. Approximately seven years and nine months later, they filed a reissue application on November 27, 1973. The reissue patent, Re. 28,563 (reissue patent), was granted on December 30, 1975. The subject of the original patent is a process, a series of steps for making a disposable slipper from plastic materials. It discloses and claims two separate methods. The first consists of manual steps with hand operated tools; the second involves the steps in a mechanized process. Only the first method concerns us, and only two claims of the original patent were directed to that method, claim 9 and dependent claim 10. The claims of the reissue patent involved here similarly pertain to the first method.

The first method was summarized in the specification of the original patent.

Generally speaking, the first method we have invented involves a series of steps, including: forming a foot opening in a first sheet of plastic material; bringing said first sheet and a second sheet of said material into face to face contact with one another; uniting said sheets in any suitable manner in a narrow region spaced outwardly from said foot opening, said region having an outline generally conformable to the human foot; and separating a slipper from the material lying outside the region.

This was essentially restated in original claim 9 (Appendix A) and illustrated by figure 4 (Appendix B) which is the same in both the original and reissue patents.

In November of 1963, while their original application was pending, plaintiffs had applied to the German Patent Office for a patent covering the same subject as the

license to make, use, and sell products under the patents. Therefore, for purposes of discussion, only the Mitchells will be characterized as "plaintiffs."

original in the United States. That office rejected all of their claims on prior art in 1966 and again upon reconsideration in 1969. Plaintiffs abandoned the German application. Almost seven years after they learned of the "primary reference relied upon by the [German] Patent Office," which was Austrian Patent No. 129,014, and more than seven years after issuance of the original patent, they filed the application which resulted in this reissue patent. The asserted basis for the reissue was that the cited art could raise a question about the patentability of at least one of their claims.

When plaintiffs had applied for the original patent, they had included process claims, product claims and an indefinite claim. In a requirement for restriction, however, they elected to prosecute only the process claims and that patent issued with ten of them. We are concerned only with claims 9 and 10.

The reissue application had 36 claims, the 10 process claims of the original patent and 26 new process claims. Plaintiffs canceled claim 9, identical to claim 9 in the original, and claim 11 in response to the examiner's rejection. But they developed a new independent claim, 37, which was essentially the same as canceled 9, except that it added a "searing" step to the process. Application claim 19 also mentioned searing.

Essentially, searing is a method of forming the edge around the foot opening of the slipper by, in the words of the specification, "collapsing a narrow portion ... of the material surrounding the opening and heating it while under compression. When the pressure and heat are removed, this narrow portion remains in a collapsed condition. It is believed to contribute to the appearance and strength of the finished article."

The examiner rejected all of the claims pertaining to the first method we are interested in because they were broader than the original patent. They therefore violated 35 U.S.C. § 251 because the application was filed more than two years after issuance of the original. Plaintiffs respond-

ed by submitting a detailed comparison between original patent claim 9 and reissue application claim 37, to show that 37 is actually narrower than 9. They apparently were persuasive, for a notice of allowance followed.

The reissue patent has 34 process claims. However, the specification and drawings did not change from those in the original patent. Reissue application claim 37 is now reissue patent claim 11, contested here, which describes "[a] method of manufacturing slippers of a heat sealable polymeric sheeting material...." (Appendix C). The other independent claim we are concerned with is reissue 31, formerly reissue application claim 19, which differs from 11 by calling for polyurethane foam, specifying that the foot opening be "punched", and calling for heat sealing with a heated die in the shape of the outline of the slipper.

In response to plaintiffs' allegations of infringement of the reissue patent by third-party defendant, and perhaps others, defendant on this motion for summary judgment has raised a series of alternative defenses. It says the reissue patent is not valid because it violated 35 U.S.C. § 251 by failure of the reissue application to set out any error in the prosecution of the original patent. Again in violation of section 251, the reissue claims are not for the same invention as was disclosed in the original patent. In any event, the reissue claims are invalid if broader than the originals because they were not filed within two years from the issuance of the original patent. If the new claims are narrower, they are barred by laches because the reissue application was filed more than seven years after plaintiffs were aware of the alleged errors surrounding the original. Defendant also says the claims are invalid for overclaiming and for obviousness in light of a series of other patents which it has provided.

*Discussion*

The court is of the view that plaintiffs cannot prevail because of the most obvious of the reasons set out by defendant. Un-

der the pertinent provision of 35 U.S.C. § 251,

> Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue.... No reissued patent shall be granted enlarging the scope of the claims of the original patent unless applied for within two years from the grant of the original.

■ A reissue patent and the original patent must be for the same invention. This is as true today, as plaintiffs concede, as it was before the Patent Act of 1952 changed the language but not the meaning of the predecessor of section 251. *In re Rowand,* 526 F.2d 558, 559 (C.C.P.A.1975); *In re Handel,* 312 F.2d 943, 948, 50 CCPA 918 (C.C.P.A.1963); *In re DeJarlais,* 233 F.2d 323, 326, 43 CCPA 900 (C.C.P.A. 1956). As far back as *Parker and Whipple Co. v. Yale Clock Co.,* 123 U.S. 87, 99, 8 S.Ct. 38, 44, 31 L.Ed. 100 (1887), and reaffirmed in *U.S. Industrial Chemicals, Inc. v. Carbide and Carbon Chemicals Corp.,* 315 U.S. 668, 676, 62 S.Ct. 839, 843, 86 L.Ed. 1105 (1942), the Supreme Court has held that inventions are the same only when a reissue describes and claims that which was embraced by the invention intended to have been secured by the original patent. "[I]t does not follow that what was indicated in the original specification, drawings or patent office model is to be considered as a part of the invention, unless the court can see, from a comparison of the two patents, that the original embodied, as the invention intended to be secured by it, what the claims of the reissue are intended to cov-

er." *Parker and Whipple Co.,* 123 U.S. at 99, 8 S.Ct. at 44.

■ The Patent and Trademark Office has no authority to cover by reissue a different invention from that apparent in the original patent. "And it is not enough that an invention might have been claimed in the original patent because it was suggested or indicated in the specification. It must appear from the face of the instrument that what is covered by the reissue was intended to have been covered and secured by the original." *U.S. Industrial Chemicals, Inc.,* 315 U.S. at 676, 62 S.Ct. at 843. What plaintiffs intended to claim in the original patent is not assessed through a subjective inquiry, *In re Mead,* 581 F.2d 251, 255 (C.C.P.A.1978), but requires "an essentially factual inquiry confined to the *objective* intent manifested by the original patent." *In re Rowand,* 526 F.2d at 560. "[I]t is the claims that measure and define the invention." *W.L. Gore & Assoc., Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1548 (Fed.Cir.1983). But everything disclosed in the original patent must be considered on this inquiry, not only the claims it listed. *In re Handel,* 312 F.2d at 948. "[T]he disclosure originally filed must convey to those skilled in the art that applicant had invented the subject matter later claimed." *In re Wilder,* 736 F.2d 1516, 1520 (Fed.Cir.1984). With this in mind, the court has carefully examined and compared the entire disclosure and claims of both the original and reissue patents.

One of the "special concepts" highlighted in the reissue patent and said to have been covered by the original, is what is called "searing." When the original patent application was filed, its claim 19 was a dependent product claim which called for a slipper on which "the edge of the foot-opening is seared." All of the product claims, including that one, however, were surrendered in a requirement for restriction, and none of the method claims mentioned the searing concept. In the reissue application, on the other hand, searing was included in several of the claims.

■ In the first place, it is impermissible to claim in a reissue that which has been surrendered in a requirement for restriction. *In re Orita*, 550 F.2d 1277, 1280 (C.C.P.A.1977). That the claim surrendered was a product claim and we are concerned with the process is of no moment. It is the concept that matters.

More importantly, the original specification says in two different places that searing the edge of the foot-opening is "not essential" to the method. And this has been restated in the reissue specification. What this shows is that searing was never intended to be secured by the original method claims. The most that can be said is that it was shown in the surrendered product claim which, as defendant says, plaintiffs may have intended to or did include in a divisional application. But when one compares the specification common to both the original and reissue patents with reissue claim 11, one sees that the only item of any significance in claim 11 beyond the combination of canceled claim 9 is the searing step which is nonessential to the method. Therefore, claims to searing in the reissue, claim 11 and dependent claims 10, 13, 14 and 17, as well as independent claim 31, are invalid as attempts to patent a different invention from that covered by the original patent.

Plaintiffs' attempt to focus the case on a burst resistant heat seam for polyurethane foam in the reissue which they say was suggested by the original patent suffers from the same disability. Reduced to its essentials, this expansive argument is an attempt to patent something other than what the original called for. When it is recalled that the combination of four steps in the first method is the invention, plaintiffs' attempts to append a method for creating a burst resistant heat seam for polyurethane foam fail.

The four steps are (1) "forming" the foot opening in one sheet of "plastic," (2) placing that sheet on top of another, (3) "uniting" the sheets in any suitable manner in a narrow region around the outer edge of the slipper, and (4) "separating" the slipper from the material lying outside the region. The specification defines the words of art plaintiffs believe justify the reissue as follows:

By "forming" is meant any effective step or steps capable of producing a sheet with an opening in it, such as cutting, molding, shearing, punching and the like.... By "uniting" is meant any fastening, sealing, sewing, cementing or other joining technique. [And earlier in the specification they say] any effective method of joinder can be utilized. Sewing, cementing, thermal sealing and induction sealing are a few examples. With polyurethane foams, we prefer to use the thermal sealing method, which will be explained further below. [The specification subsequently explains that the invention may be practiced with "electronic" heat sealing as well as "thermal" heat sealing and suggests a number of prior patents as examples.]

Finally, plaintiffs' specification has this to say about plastic:

By "plastic" is meant any material resembling a natural or synthetic rubber in its properties. It should be flexible, stretchy and preferably, though not necessarily, spongey. That is, the material preferably possesses a cell structure. A preferred example of such spongey materials having cell structure is polyurethane.

But the specification says that either sheet of material used in making the slipper may be non-cellular plastic or foam, or both may be of the same material and "the substitution of cellular material for non-cellular ... would not alter the sequence or relationship of the essential steps in our process.... [N]o intention to exclude any of the above modifications or others should be inferred."

■ What this shows is that plaintiffs intended no limitation on the types of plastic materials or on the means of uniting them. The specification neither recognizes nor offers solutions to any problems that might be encountered with heat sealing or the use of foam. Therefore, the extensive

battle of affidavits between the parties and experts about difficulties with heat sealing foam and the creation of a strong burst resistant perimetral heat seal are irrelevant. Expert scientific testimony cannot enlarge a patent. *U.S. Chemicals Co.*, 315 U.S. at 678, 62 S.Ct. at 844; *In re Vamco Machine & Tool, Inc.*, 752 F.2d 1564 at 1575, 1577 (Fed.Cir.1985). If those features are not disclosed or claimed in the patent, even if they are patentable inventions, they are not within the protection of the original much less the reissue patent. *See Kemode Mfg. Co. v. United States*, 347 F.2d 315, 318, 171 Ct.Cl. 698 (1965). The patent claims read in light of the specification, as they must be, *Schriber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 217, 61 S.Ct. 235, 238, 85 L.Ed. 132 (1940), show no basis for patentability. *See In re Lundberg*, 253 F.2d 244, 247, 45 CCPA 838 (1958).

Plaintiffs' special concept for "punching" is similarly deficient. The specification listed punching as only one of many ways of creating a foot opening in the slipper, along with "cutting, molding, shearing, ... and the like." This does not suggest anything special about punching and detracts from plaintiffs' assertion it was intended to be patented. The same is true of the special concept for "shearing" the excess material from around the finished slipper. The specification suggests this may be done not only by shearing, but by cutting, slicing or tearing, as well. The court concludes that none of the pertinent reissue concepts plaintiffs thought covered by the original can withstand comparison.

Even if the court were to assume for the argument, as defendant alternatively asks, that plaintiffs' reissue was for the same invention, they could not prevail. If the reissue is broader than the original, as the Patent Office originally ruled, probably correctly, it runs afoul of section 251 because not filed within two years of the original. *Ball Corp. v. United States*, 729 F.2d 1429, 1438 (Fed.Cir.1984). If the reissue is narrower, as plaintiffs apparently persuaded the examiner, laches would apply. The delay of more than seven years

after plaintiffs learned of the alleged error affecting their original patent is unreasonably long and not justified. For that period of time, they usurped "the right of the public to graze in the field erroneously claimed as a private preserve." *Better Packages, Inc. v. Derby Sealers, Inc.*, 43 F.Supp. 123, 126 (D.Conn.1941).

Plaintiffs say there is no diligence requirement for narrowing patents and the doctrine of intervening rights provides sufficient protection to one discomforted by delay. Even if diligence is relevant, prejudice from the delay must be shown.

The court disagrees. The doctrine of intervening rights provides relief for one practicing the narrowed aspects of the patent in the interim between issue and reissue, *see* 35 U.S.C. § 252, which is not our case, but does nothing to adjust the rights of others unknown who wrongfully may have been deterred because of the apparent expansiveness of the patent. *See, e.g., General Radio Co. v. Allen B. DuMont Laboratories*, 129 F.2d 608, 613 (3rd Cir. 1942); *Better Packages, Inc.*, 43 F.Supp. at 126, 127. The concept of prejudice does not apply on these facts because of the impossibility of finding those among the public who may have been discouraged and forsaken the opportunity to practice what they had a right to. In view of the court's conclusions, however, it is unnecessary to develop this theme further or to address the remainder of defendant's alternative defenses.

### Design Patent

The contest over the validity of the design patent, Des. 200,897, held by plaintiff Winalee Mitchell, the drawing of which is partially reproduced at Appendix D, is considerably less vigorous. It appears that in the prosecution of a predecessor application to the one that resulted in this design patent, two embodiments of a design for a slipper were disclosed. The application was rejected on prior art. The examiner said,

[I]t now appears that applicant is relying for novelty upon the broad concept of a

flat folded slipper having an oval-like foot inserting opening on the upper half. Such broad design is deemed unpatentable over LeDorf [Patent No. 1,830,471], and to make it of heavier or padded material is deemed to be obvious within the terms of 35 U.S.C. 103. Kane [D–136, 180] is cited as showing the stitched or welted effect employed while the Madamoiselle [not in the record] item is cited as cumulative art.

Plaintiff responded that the upper and lower portions of a slipper with the design called for in that application curved gradually downwards and upwards, respectively, creating a different appearance from that of a flat slipper shown in the cited prior art. She said, "When Applicant thinks of a *flat slipper,* she has in mind a slipper which has *no upward or downward curving appearance when viewed from the side.*" (Plaintiff's emphasis.) The response also emphasized that the curving lines met along a rim of material protruding horizontally outward from where the upper and lower parts of the slipper met. Our design patent, consisting of one of the embodiments of the earlier application addressed by plaintiff and the examiner, thereafter was issued.

From this, defendant presumes the design was patented because of the curved lines and rim features. The file wrapper suggests nothing else. Plaintiff concedes she urged these features as novel. But she says this does not lead to the conclusion that those features were the only novel, nonobvious features on which she could rely, though no others are suggested.

Study of the patent and the affidavits of the parties' experts, and inspection of the slipper, one of which is in the record, shows that the pertinent configuration results from the mechanical requirements of heat sealing around the outer edges of the two pieces of polyurethane foam which form the upper and lower parts of the slipper.

The curved lines are the product of compression at the rim and the resiliency of polyurethane foam when subjected to heat sealing. See Appendix D, figure 4.

In spite of the counter arguments, the court sees no profound dispute about this. Plaintiff's experts, for some reason assuming only use of synthetic polymeric film sheeting rather than also polyurethane foam,** say that with heat sealing "the seam between the upper and lower portions may take a variety of ornamental exterior configurations [citing illustrations].... Thus, the exterior ornamental appearance of the seals may vary considerably while each seam serves the same physical function, that of holding the slipper together. The exterior appearance is not dictated solely by the function of the seal." Defendant's expert more comprehensively responded,

> Design Patent No. 200,897 depicts a necessary, functional, and common flange-like seam area, extending outwardly from the body of the product and in a midline fashion relative thereto. Such flange serves a functional purpose, that of being the joining area for the two sheets. Patentee could have selected another functional seal, creating a different appearance. However, the patentee depicted a seal of the type shown, which seal evidences the exact and most common functional mode thin web seal elected by the patentee.

To the court, this is dispositive. Plaintiff says the seal function does not "solely" dictate the appearance, implying she might have chosen some more imaginative configuration before or during fusion of the two sheets by heat sealing, or perhaps even thereafter in the manner of trimming. Defendant's point, however, is that she did not; she chose "the exact and most common functional mode thin web seal." The function, not the artistry of the patentee, dictated the appearance.

** Plaintiff does not concede the design patent applies only to slippers made of foam, although in a sworn description of the concepts she thought were new, dated October 2, 1961, she refers to "foam material." From what the experts say, the court concludes the same result would obtain using either type material.

■ A configuration that proceeds primarily from functional and mechanical requirements or as dictated by them is not patentable. *See Bentley v. Sunset House Distributing Corp.*, 359 F.2d 140, 145 (9th Cir.1966); *Hygienic Specialties Co. v. H.G. Salzman*, 302 F.2d 614, 618 (2d Cir.1962). And more specifically, a tear seam like this and its converging lines are truly functional and not ornamental. *See Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d 694, 696 (2d Cir.1961).

■ Plaintiff correctly notes that the proper test for design patentability requires consideration of the entire design, not merely selected features of it. *See In re Rosen*, 673 F.2d 388, 391 (C.C.P.A.1982). Defendant does not quarrel with this, but points out that in the absence of any other features of novelty, those which persuaded the examiner ought to control. If they are invalid, there is nothing else. *Rosen* is not to the contrary.

■ When it is recalled that what became this design patent was earlier rejected on prior art, and only allowed after these specific features were urged in response, it is appropriate to consider first whether they are the "product of esthetic skill and artistic conception." *Blisscraft of Hollywood*, 294 F.2d at 696. And these were not. This is a fair approach because plaintiff would not have gotten even this far except for her successful advocacy of these features in the Patent Office.

### Conclusion

Accordingly, defendant's motion for summary judgment is GRANTED, and plaintiffs' cross-motion for summary judgment is DENIED. The case will be dismissed with costs to the prevailing parties.

It is so ORDERED.

### Appendices

*Appendix A*

9. A method of manufacturing slippers of heat-sealable synthetic polymeric sheeting material comprising:

forming an elongated foot-opening in a first sheet of said material;

subsequently bringing said first sheet together with a second sheet of said material in face to face relationship;

exerting firm pressure on the exposed faces of said sheets in at least one narrow region surrounding said foot-opening, said region being spaced outwardly from said foot-opening and having an elongated outline generally conformable to the human foot, said outline being elongated in generally the same direction as said foot-opening;

raising the temperature of said sheets within said region to unite said sheets with one another within said region; and

separating a slipper from the material lying outside of said region.

*Appendix B*

FIG.4

*Appendix C*

11. A method of manufacturing slippers of a heat-sealable synthetic polymeric sheeting material comprising:

providing first and second sheets of the synthetic polymeric sheeting material, at least one of which is stretchy cellular material;

forming an elongated foot opening in the first sheet of said material;

subsequently bringing the first sheet together with the second sheet of said material in face to face relationship;

exerting firm pressure on the exposed faces of the sheets in at least one narrow region surrounding the foot opening, said region being spaced outwardly from the foot opening and having an elongated outline generally conformable to the human foot, said outline being elongated in generally the same direction as said foot opening;

raising the temperature of the sheets within said region to unite said sheets with one another within said region;

searing the periphery of the foot opening by collapsing a narrow portion of the material surrounding the opening and heating it while under compression; and

separating a slipper from the material lying outside of said region.

*Appendix D*