MAYER, Circuit Judge,
dissenting.
I respectfully dissent. There can be no infringement of U.S. Reissue Patent No. 37,314 (the “'314 patent”) because that patent is invalid for improper reissue. Reissue is available under 35 U.S.C. § 251 to rectify an “error” resulting from inadvertence, accident, or mistake. No such error was present in U.S. Patent No. 5,260,440 (the “ '440 patent”), so there is no basis upon which it could properly be reissued. Furthermore,'Shionogi Seiyaku Kabushiki Kaisha (“Shionogi”) has forfeited the right to obtain reissue by its failure to exercise due diligence in seeking to rectify the alleged defect in the '440 patent.
I.
“Congress limited reissue to instances where the patentee could demonstrate an ‘error without any deceptive intention.’ ” In re Youman, 679 F.3d 1335, 1342 (Fed. Cir.2012) (quoting 35 U.S.C. § 251); see also In re Serenkin, 479 F.3d 1359, 1363 (Fed.Cir.2007) (concluding that reissue was not available where a patentee’s attorney made a “conscious decision” to accept a later filing date for his application); Hewlett-Packard Co. v. Bausch & Lomb, Inc., 882 F.2d 1556, 1565 (Fed.Cir.1989) (emphasizing that a party seeking reissue must establish “inadvertent error in conduct”); In re Hounsfield, 699 F.2d 1320, 1323 (Fed.Cir.1983) (explaining that reissue is designed to “correct an inadvertent error in the original patent”); In re Whit-telsey, 83 F.2d 894, 895 (C.C.P.A.1936) (concluding that reissue was improper where “there was no inadvertence or mistake” in a patentee’s decision to omit certain claims from his original application); In re Murray, 77 F.2d 651, 655 (C.C.P.A. 1935) (explaining that a patent may not be reissued “for the purpose of correcting errors of judgment”). Prior to 1952, the reissue statute specifically provided that defects correctible through reissue were those that had resulted from “inadvertence, accident, or mistake.” 35 U.S.C. § 64 (1946); In re Weiler, 790 F.2d 1576, *532 1582 (Fed.Cir.1986). When it enacted section 251, the current reissue provision, Congress intended to retain the “inadvertence, accident, or mistake” standard that had existed under the earlier statute.[1] Hewlett-Packard, 882 F.2d at 1565; see In re Wadlinger, 496 F.2d 1200, 1207 (C.C.P.A.1974) (emphasizing that when Congress substituted the word “error” for the words “inadvertence, accident, or mistake,” it did not intend to make “a substantive change”).
Here, Shionogi made an error in judgment when it elected to prosecute a broad genus claim which covered trillions of pyrimidine compounds and which clearly overlapped with a known prior art reference, European Published Application No. 0367895 (“Sandoz”). There is no evidence that the overlap between claim 1 of the '440 patent and Sandoz was the result of ignorance or inadvertence, rather than a deliberate attempt to obtain patent rights that were as broad in scope as possible. Not a single inventor or patent prosecutor testified that he or she unknowingly or inadvertently introduced the overlap between Sandoz and claim 1. Indeed, the only inventor to testify at trial, Haruo Koike, stated that he did not believe that there was any error in the '440 patent. Joint App. 22763-65.
It is undisputed that Shionogi was aware of Sandoz when it prosecuted and obtained the broad claims of the '440 patent. A June 1991 Shionogi internal search report identified Sandoz as relevant prior art. In October 1992, Shionogi received a European Patent Office (“EPO”) search report with an attached copy of Sandoz. This report identified Sandoz as an “X” reference, meaning that the reference was “particularly relevant if taken alone.” Shionogi received the EPO search report a second time when the European counterpart to the '440 patent was published in January 1993.
Tomoko Kitamura, the Shionogi employee who filed the '440 application, testified at trial, but never stated that she misapprehended the Sandoz disclosure or that she failed to appreciate the overlap between it and claim 1 of the '440 patent. To the contrary, the record shows that Shionogi was well aware of Sandoz at the time Kitamura filed the '440 application. A November 1991 internal search report listed Sandoz as relevant prior art and explained that it disclosed a “pyrimidine skeleton” with statin activity. Given the obvious overlap between Sandoz and claim 1, it defies credulity to accept that Kitamura, who had had several years of experience preparing and prosecuting patent applications and who holds a degree in organic chemical synthesis, would fail to appreciate that claim 1 was directed to subject matter previously disclosed in Sandoz.[2]
*533 When Kitamura left Shionogi in July 1992, Takashi Shibata assumed primary responsibility for prosecution of the '440 application. Shibata received the EPO search report declaring Sandoz to be “particularly relevant” stand-alone prior art, Shibata, moreover, specifically instructed Shionogi scientists to test and compare the preferred compounds disclosed in Sandoz with those disclosed in the '440 application. Although Shibata testified at trial, he, like Kitamura, never stated that he failed to appreciate the scope of the invention disclosed in the '440 patent or that he was unaware of the obvious overlap between claim 1 and Sandoz.
In 1997, Shionogi and Zeneca Limited (“Zeneca”)[3] entered into discussions regarding a licensing agreement that would allow Zeneca to commercialize rosuvasta-tin, the most promising compound disclosed in the '440 patent. During these negotiations, Zeneca raised concerns that Sandoz was potentially invalidating prior art. Joint App. 2285-86. In response, Shionogi conceded that it “had been aware of [Sandoz] ... prior to filing the ['440 application]” and that there was an overlap between claim 1 of the '440 patent and “the disclosure and claims of [Sandoz].” Id. at 2290. Shionogi asserted, however, that “not so much attention was paid” to San-doz because it believed that rosuvastatin “did not fall within the scope of [Sandoz].” Id. Significantly, when responding to Zeneca’s invalidity concerns, Shionogi did not assert that it had previously misunderstood the scope of the Sandoz disclosure or that it had unintentionally or inadvertently introduced the overlap between Sandoz and claim 1.
A patentee cannot establish correctible “error” under section 251 simply by demonstrating that his original patent contains a defect. Hewlett-Packard, 882 F.2d at 1565 (emphasizing that the fact that a patent is “defective” does not “give[ ] rise to an inference of ‘oversight’ ”); Weiler, 790 F.2d at 1582-83 (concluding that reissue was not permitted where a patentee failed to establish that he had unintentionally omitted subject matter from his original claims); In re Mead, 581 F.2d 251, 257 (C.C.P.A.1978) (holding that a “conscious choice” not to file a continuing application did not constitute correctible error); In re Byers, 230 F.2d 451, 454 (C.C.P.A.1956) (emphasizing that the deliberate amendment of a claim did not constitute correcti-ble error). Instead, reissue is warranted only where a patentee “supplies ... facts indicating how ... ignorance,” accident, or mistake caused an error in his claims:
[The patentee’s] reliance on allegations of the inventors’ ignorance of drafting and claiming technique and counsel’s ignorance of the invention is unavailing. Those allegations could be frequently made, and, if accepted as establishing error, would require the grant of reissues on anything and everything mentioned in a disclosure. [The patentee] supplies no facts indicating how the ignorance relied on caused any error.... [Section] 251 does not authorize the pat-entee to re-present his application.
Weiler, 790 F.2d at 1583 n. 4 (emphasis added); see also In re Wittry, 489 F.2d 1299, 1302 (C.C.P.A.1974) (holding reissue claims invalid where “the declarations [did] not present any reasonable explanation of *534 any errors in the original claims which the reissue would overcome”).
Serenkin, 479 F.3d at 1362-65, is instructive on this issue. There, a prosecuting attorney chose to accept a later filing date in exchange for being allowed to include additional drawings with his application. The patentee later sought reissue, arguing that his attorney had “made the wrong procedural choice” by accepting the later filing date. M at 1362. We rejected this argument, explaining that reissue is appropriate where there has been “a genuine error,” but not where a patentee or his attorney has made “a deliberate, but subsequently found to be disadvantageous, choice.” M at 1364.
A similar analysis applies here. Shiono-gi made an error in judgment when it prosecuted and maintained a broad genus claim that clearly overlapped, with a known prior art reference. Absent any evidence showing that this overlap was the result of inadvertence or mistake, however, Shiono-gi had no right to invoke the reissue process in order to remedy its “deliberate, but subsequently found to be disadvantageous, choice.” Id.; Hewlett-Packard, 882 F.2d at 1566 (rejecting the argument that “an error in conduct must be presumed, absent affirmative evidence that the defect in the patent which is asserted in the reissue application was intentional”); see also Yon-man, 679 F.3d at 1343 (explaining that section 251’s “error” requirement covers “inadvertence or mistake,” not “deliberate” choices made by the patentee). As we have previously made clear, section 251 “was not enacted as a panacea for all patent prosecution problems, nor as a grant to the patentee of a second opportunity to prosecute de novo his original application.” Weiler, 790 F.2d at 1582.
On appeal, Shionogi argues that the overlap with Sandoz must have been unintentional because “no rational patent applicant would intentionally pursue claims known to be invalid.” This argument is unpersuasive for two reasons. First, the fact that claim 1 overlapped with Sandoz did not necessarily render that claim invalid. A subset of a broad genus of prior art compounds is potentially patentable. See Eli Lilly & Co. v. Bd. of Regents, 334 F.3d 1264, 1270 (Fed.Cir.2003). Indeed, during the negotiations with Zeneca, Shionogi’s U.S. patent attorney stated that claim 1 of the '440 patent was not necessarily invalid in view of Sandoz “because it [could] be said that ours is a selection invention from within the genus of [Sandoz].” Joint App. 5187.
Second, patentees not infrequently intentionally draft very broad independent claims, but “hedge” against invalidity by drafting narrower dependent claims. See In re Tanaka, 640 F.3d 1246, 1249-51 (Fed.Cir.2011). Here, Shionogi believed that even if the broad genus claim contained in claim 1 was subsequently found to be invalid, subgenus claims 2 and 3, which did not overlap with Sandoz, would protect rosuvastatin, its most important compound. See Joint App. 20513-15; 8532-37; 20208-09.
II.
In concluding that the '440 patent was properly reissued, the majority conflates the issue of whether Shionogi was guilty of inequitable conduct with the question of whether it met the requirements for reissue under section 251. Shionogi failed to cite any relevant prior art to the United States Patent and Trademark Office (“PTO”) when it prosecuted the '440 application. Indeed, the record suggests that Shionogi acted with intent to deceive the PTO when it failed to disclose the highly material Bayer application, see Japanese Published Patent Application No, 1989-261377, and the EPO search report identi *535 fying Sandoz as a highly relevant standalone prior art reference. Prior to Thera-sense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1290-93 (Fed.Cir.2011) (en banc), this conduct would surely have been censored as fraud on the patent office. Even accepting arguendo that Shionogi’s malfeasance was insufficient to satisfy the standard for inequitable conduct articulated in Therasense, however, this does not mean that the '440 patent was validly reissued. Whether Shionogi intended to deceive the PTO by failing to disclose Sandoz is a wholly separate issue from whether it deliberately introduced an overlap between Sandoz and the '440 patent.
Shionogi asserts that it failed to disclose material prior art to the PTO because of the “chaos” and “confusion” that ensued after Kitamura resigned in July 1992. As-traZeneca Pharms. LP v. Mylan Pharms. Inc., 719 F.Supp.2d 388, 400 (D.Del.2010). Kitamura, however, had already filed the '440 application — with its overlap with Sandoz — when she left Shionogi. There is no evidence that there was any confusion or chaos in the Shionogi patent department before Kitamura’s departure. Thus, while confusion within the Shionogi patent department may have led to the failure to disclose material prior art, there is no evidence that it led to the overlap between Sandoz and claim 1.
III.
When Shionogi submitted its reissue application, it filed a declaration stating that it had “claimed more than [it] had a right to claim by reason of the disclosure of [Sandoz].” Joint App. 2812. Shionogi could have remedied the overlap with San-doz by simply revising claim 1. Instead, however, Shionogi ultimately cancelled all of the claims of the '440 patent — including claims 2 and 3 which did not overlap with Sandoz — and replaced them with new claims narrowly directed to rosuvastatin. If the overlap with Sandoz were the result of inadvertence or mistake and Shionogi was merely attempting to rectify this alleged error, it presumably would have simply revised claim 1 and left claims 2 and 3 intact.
Shionogi’s initial failure to obtain a narrow claim directed to rosuvastatin was not the result of error or mistake, but was instead part of a deliberate effort to avoid alerting Bayer, its competitor, of its interest in the compound. Shionogi was very concerned that if Bayer discovered that Shionogi was focusing on rosuvastatin it would try to include that compound in the claims of its pending patent application. In a November 1991 memorandum, for example, Shionogi advised its employees to be “on maximum alert” to prevent “leaks of secrets relating to the status of the Shionogi [rosuvastatin] development” because “Bayer might make an effort to assert” that rosuvastatin was included within the claims of its pending application. Joint App. 2241. Indeed, at trial Shibata acknowledged that Shionogi was concerned “that if Bayer found out that Shionogi was focusing on [rosuvastatin], Bayer would try to cover [rosuvastatin] in their pending ... application.” Joint App. 20760.
There is no evidence that the failure to include a claim directed to rosuvastatin was the result of “error” or mistake. Instead, the record contains strong evidence that Shionogi failed to specifically claim rosuvastatin in order to avoid “tipping off” Bayer about its interest in the compound.[4] *536 It was only after the Bayer application had been withdrawn that Shionogi decided to add narrow claims directed to rosuvastatin and its salts.
Contrary to the majority’s assertions, ante at 523-24, the situation presented here is far different from that presented in Tanaka. There, we concluded that reissue was proper where a patentee retained his original claims, but added a narrow dependent claim. 640 F.3d at 1249-51. In Ta-naka, however, the inventor supported his claim of error by filing a declaration explaining that he “did not fully appreciate the process of claiming according to U.S. practice.... ” Id. at 1247. Here, by contrast, there is no evidence that the overlap with Sandoz was due to any misunderstanding of PTO requirements or procedures. Shionogi had extensive experience prosecuting U.S. patents. Indeed, before November 1993 when the '440 patent issued, Shionogi had applied for and received more than 200 U.S. patents. Significantly, at approximately the same time that Kitamura filed the application for the pyrimidine compounds disclosed in the '440 patent, she also filed an application directed to pyrrole statin compounds. This pyrrole application contained a narrow claim directed to the preferred pyrrole compound. Kitamura, therefore, clearly understood how to draft a claim specifically directed to a preferred compound and yet failed to do so when she filed the '440 application.
“Reissue is an extraordinary procedure and must be adequately supported by the circumstances detailed in [section 251].” Ball Corp. v. United States, 729 F.2d 1429, 1435 (Fed.Cir.1984) (footnote omitted); see also Hewlett-Packard, 882 F.2d at 1566 (concluding that reissue was not permitted where a patentee failed to provide an adequate “explanation of what his error was and how and why it occurred” (emphasis omitted)). Thus, a reissue patent is invalid where, as here, a patentee fails to substantiate assertions of “error” in the original claims. See Hewlett-Packard, 882 F.2d at 1565 (“[A] reissue applicant does not make a prima facie case of error in conduct merely by submitting a sworn statement which parrots the statutory language.”); Wittry, 489 F.2d at 1302 (concluding that reissue was improper where “the declarations [did] not present any reasonable explanation of any errors in the original claims which the reissue would overcome”). Here, Shionogi obtained claims which obviously overlapped with a known prior art reference and intentionally failed to seek a claim directed to its preferred compound in order to gain a competitive advantage in the marketplace. Such machinations constitute an abuse of the reissue process and are wholly contrary to the objectives of section 251, a statute predicated “on fundamental principles of equity and fairness,” Weiler, 790 F.2d at 1579; see also Serenkin, 479 F.3d at 1362 (emphasizing that “the remedial function of the [reissue] statute is not without limits” and “the deliberate action of an inventor or attorney during prosecution generally fails to qualify as a correctable error under § 251”); In re Harita, 847 F.2d 801, 809 (Fed.Cir.1988) (“In any given case, the [reissue] statute should be so applied to the facts that justice will be done both to the patentee and the public.”).
The claims of a validly-issued patent serve an important notice function, alerting the public of the metes and bounds of an inventor’s discovery. See Superior Fireplace Co. v. Majestic Prods. Co., 270 *537 F.3d 1358, 1371 (Fed.Cir.2001) (“This court has previously noted the propriety of independently considering the public notice function in interpreting the patent statutes.”). This public notice function will be subverted if the “error” requirement is read out of the reissue statute and patentees are given free reign to rewrite their claims whenever they find it expedient to do so. See Hester Indus., Inc. v. Stein, Inc., 142 F.3d 1472, 1484 (Fed.Cir.1998) (“[H]ere, the second attorney draft[ed] the [reissue] claims nearly a decade later and with the distinct advantage of having before him the exact product offered by the now accused infringer.”).
IV.
Equity dictates that a patentee exercise due diligence in seeking to rectify a defect in his patent. See Miller v. Bridgeport Brass Co., 104 U.S. 350, 351, 26 L.Ed. 783 (1881) (explaining that where a “mistake was so obvious as to be instantly discernible on opening the letters-patent,” any right to have the patent reissued “was abandoned and lost by unreasonable delay”); Gen. Radio Co. v. Allen B. Du Mont Labs., Inc., 129 F.2d 608, 612 (3d Cir.1942) (“It has long been settled that due diligence must be exercised in discovering a mistake in a patent and that an unreasonable delay in making application for reissue invalidates the reissue patent.”). The reasons for requiring prompt action to correct a patent defect “may be just as great in a case where the patentee seeks to narrow his claims as where he seeks to broaden them.” Gen. Radio, 129 F.2d at 613. Where a patentee unjustifiably delays seeking reissue of overly broad claims, he “usurpfs] the right of the public to graze in the field erroneously claimed as a private preserve.” Principle Bus. Enters., Inc. v. United States, 7 Cl.Ct. 433, 438 (Cl.Ct.1985) (citations and internal quotation marks omitted); Gen. Radio, 129 F.2d at 613 (emphasizing that failure to take prompt action to narrow overly broad claims gives a patentee an “unwarranted claim of monopoly”).
Here, Shionogi learned of the Sandoz reference no later than June 1991 when an internal search report issued in connection with the '440 application identified Sandoz as relevant prior art. The importance of Sandoz to the claims of the '440 patent was made clear when Shionogi received, in October 1992, the EPO search report that identified Sandoz as a “particularly relevant” standalone prior art reference. On February 21,1996, the EPO rejected many of the claims in the European counterpart to the '440 patent based upon Sandoz. Shionogi thereafter narrowed claim 1 in the European application and added a claim specific to rosuvastatin. It waited for over two years, however, until August 1998, to seek reissue of the '440 patent. Thus, Shionogi maintained the broad claims of the '440 patent for more than seven years after learning of the Sandoz reference, for more than six years after receiving the EPO report identifying San-doz as particularly relevant stand-alone prior art, for more than five years after issuance of the '440 patent, and for two years after surrendering the corresponding claims in the European application due to the Sandoz reference.[5] It has proffered no adequate justification for its failure to rectify the alleged error in the '440 patent in a timely manner.
*538 “The privilege of correcting an acknowledged error in [an] original patent may in the public interest be validly conditioned upon the patentee proceeding promptly.” Gen. Radio, 129 F.2d at 613. During the years when Shionogi maintained its over-broad claim, there was strong and widespread interest in the development of new and more effective statins. Joint App. 20148-51; 1755-57. By failing to act promptly to narrow its overbroad claim, Shionogi deprived the public of the right to experiment with, and to improve upon, the compounds encompassed by claim l.[6] Because Shionogi’s delay in seeking to remedy the alleged defect in the '440 patent was unreasonable, it has forfeited the right to obtain reissue under section 251.

. Section 251, during the relevant time period, provided:
Whenever any patent is, through eiror without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Director shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue.
35 U.S.C. § 251 (emphasis added). Pursuant to the Leahy-Smith America Invents Act, Pub.L. No. 112-29, § 20(d), 125 Stat. 284, 333 (2011), the words "without any deceptive intention” were deleted from the statute.

. At trial, Kitamura stated that she believed that none of the prior art cited in internal search reports raised "patentability concerns” with respect to Shionogi's pyrimidine statins. *533 Joint App. 21458. Contrary to the majority’s assertions, ante at 523-24, however, Kitamura never testified that she failed to appreciate that claim 1 of the '440 patent overlapped with Sandoz.

. Zeneca is the predecessor to AstraZeneca UK Limited.

. Shionogi presents no plausible alternative explanation for its failure to specifically claim rosuvastatin. Instead, Shionogi argues that it did not attempt to conceal rosuvastatin from Bayer because rosuvastatin was described in the '440 patent’s specification. Describing a compound in the examples contained in the specification, however, is unlikely to be the *536 "red flag” that narrowly claiming a compound would be, particularly if that compound is the only one specifically claimed.

. On appeal, Shionogi asserts that it was not aware of the overlap between Sandoz and claim 1 until October 1997. This contention is belied by the record. Testimony at trial established that Shionogi was already aware of the overlap between Sandoz and claim 1 when it received the October 1997 letter from Zeneca pointing out this overlap. Joint App. 20463.

. The doctrine of "intervening rights,” see 35 U.S.C. § 252, does nothing to protect "the rights of others unknown who wrongfully may have been deterred because of the apparent expansiveness of the patent,” Principle Bus., 7 Cl.Ct. at 438.