**HEWLETT–PACKARD COMPANY,**
**Plaintiff/Cross–Appellant,**

v.

**BAUSCH & LOMB INCORPORATED,**
**Defendant–Appellant.**

Nos. 88–1590, 88–1591.

United States Court of Appeals,
Federal Circuit.

Aug. 9, 1989.

Rehearing Denied Oct. 6, 1989.

S. Leslie Misrock, of Pennie & Edmonds, New York City, argued, for plaintiff/cross-appellant. With him on the brief, was Jonathan A. Marshall, of Pennie & Edmonds. Of counsel were Brian D. Coggio, Jennifer Gordon, Jon R. Stark and Bruce J. Barker, of Pennie & Edmonds, and William H. MacAllister, of Hewlett–Packard Co., Palo Alto, Cal.

Laurence H. Pretty, of Pretty, Schroeder, Brueggemann & Clark, Los Angeles, Cal., argued, for defendant-appellant. Of counsel were Gary A. Clark and John T. Wiedemann, of Pretty, Schroeder, Brueggemann & Clark, James W. Colbert, III, of O'Melveny & Myers, Los Angeles, Cal., and Bernard D. Bogdon, of Bausch & Lomb Inc., Rochester, N.Y.

Before NIES and BISSELL, Circuit Judges, and BALDWIN, Senior Circuit Judge.

NIES, Circuit Judge.

Bausch and Lomb Incorporated (B & L) appeals from a final judgment, in favor of Hewlett–Packard Company (HP), entered by the United States District Court for the Northern District of California in a patent

infringement suit. *Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 692 F.Supp. 1118 (N.D.Cal.1988). The judgment is based on the district court's holdings that B & L's United States Patent No. Re. 31,684 ('684) is unenforceable and partially invalid. We affirm-in-part, vacate-in-part, and remand.

The court held claims 10–12, which were added during reissue, invalid because B & L filed blatantly inaccurate affidavits to support reissue. Absent the affidavits, the court held, B & L failed to comply with the requirements of the oath specified in 35 U.S.C. § 251 (1982) and 37 C.F.R. § 1.175 (1988). The court rejected HP's argument, however, that the improper oath also rendered claims 1–9, which were carried over unchanged from the original patent, invalid. *Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 8 USPQ2d 1177 (N.D.Cal.1988); *Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 692 F.Supp. 1118, 1120–32, 8 USPQ2d 1179, 1181–91 (N.D.Cal.1988). Nevertheless, the district court held that B & L's conduct in prosecuting the reissue, including the submission of the false affidavits, rose to the level of inequitable conduct. In the court's view, such misconduct tainted all 12 claims and rendered the '684 patent entirely unenforceable. *Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 692 F.Supp. 1118, 1132–50, 8 USPQ2d 1179, 1192–1206 (N.D.Cal.1988).

We affirm the court's holding that claims 10–12, but not claims 1–9, are invalid because the reissue application was defective. It is unclear, however, whether the district court's determination of inequitable conduct is in accord with this court's recent pronouncement in *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876–77, 9 USPQ2d 1384, 1392 (Fed.Cir.1988) (in banc). Accordingly, we vacate that part of the judgment and remand for reconsideration.

Finally, B & L asserts it is entitled to a retrial of the case. Following entry of judgment, B & L moved the trial judge to disqualify himself pursuant to 28 U.S.C. § 455 (1982) upon learning that HP employed the judge's son. That circumstance in itself, per B & L, would cause a reasonable person to question the judge's impartiality. B & L appeals the denial of its motion. *Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 8 USPQ2d 1206 (N.D.Cal. 1988). We affirm.

## I

## ISSUES

1. Did the district court err, by applying an incorrect legal standard, in holding B & L guilty of inequitable conduct in prosecuting the reissue application?

2. Where inequitable conduct is found during reissue proceedings, which renders all new claims added or amended during reissue unenforceable, is a finding of actual fraud or bad faith required to hold the unchanged claims carried over from the original patent also unenforceable?

3. Is a failure to include narrower or dependent claims in a patent sufficient in itself to establish error warranting reissue under 35 U.S.C. § 251?

4. Where a reissue patent issues from a defective application, are all claims invalid or are only the claims added or amended during reissue invalid?

5. Does 28 U.S.C. § 455(a) (1982) require the judge's recusal in this case?

## II

## BACKGROUND

John Yeiser invented an "X–Y Plotter," described in United States Patent No. 3,761,950 ('950), in which chart paper moves under a marking pen. Yeiser's patent issued in 1973 with nine claims.[1] Fol-

---

**1.** Claim 1 of the '950 patent is as follows:

1. An X–Y plotter comprising:
a table adapted to support a cut chart slidably thereon;
a fixed carriage guide extending across said table in an X-direction;

a carriage with a marking element, supported by said guide and movable therealong to provide X-deflection of said marking element across said chart;
driving roller means with pinch roller means engageable with said chart to provide bidirectional recording displacement of said chart

lowing a series of assignments, the Milton Roy Company (MRC) acquired the '950 patent. The invention claimed in that patent was commercialized only briefly. MRC had been out of the plotter business for some time when, in late 1980 or early 1981, HP introduced its first moving-paper X–Y plotter, with great success.

B & L, a competitor of HP, discovered the '950 patent during an investigation of HP's patent protection on its plotter. In 1982, B & L bought the '950 patent from MRC for $30,000, admittedly for the purpose of gaining leverage in negotiations— hoping to obtain a cross license from HP— and possible litigation. The record indicates that B & L was concerned, however, that claim 1, which arguably covers HP's plotter and is the only independent claim asserted, was overly broad. To obtain narrower claims which would incorporate details of the HP plotter specifically, B & L filed a reissue application containing three new claims, 10–12.[2] The original nine claims of the '950 patent were included in the reissue application without substantive change.

The PTO rejected the application, *inter alia*, on the grounds that B & L failed to specify either an error warranting reissue or how the error occurred. B & L successfully overcame the PTO rejections by supplementing the initial declaration with two affidavits signed by the patent agent, Lawrence Fleming, who had prosecuted the original patent. The facts surrounding those affidavits and the effect they had on the reissue will be discussed below in detail in connection with addressing the issues of the validity and enforceability of the '684

patent, which are the central issues of this appeal.

With issuance of the '684 patent imminent, B & L charged HP with infringement. HP countered with a petition for reexamination of claims 1, 2, and 10–12 over certain prior art. The PTO found that HP's petition raised a substantial new question of patentability, but ultimately upheld the validity of all claims. HP then filed a declaratory judgment action in October 1984, asserting invalidity of all claims of the '684 patent under 35 U.S.C. §§ 102, 103, 112, and 251 (1982), and later added an allegation of unenforceability for inequitable conduct in B & L's prosecution of the reissue application. B & L counterclaimed, charging HP with infringement of claims 1 and 2, which were original claims, and claims 10–12 added by reissue.

On a summary judgment motion, the district court held claims 10–12, but not claims 1–9, invalid. More specifically, the court found that the oath (declaration) in the application for reissue was defective. B & L contends that, as a matter of law, the oath was not defective. On the other hand, HP urges that, because the oath was defective, the district court should have held original claims 1–9 also invalid.

A separate trial on the issue of inequitable conduct was then held, after which the district court held all claims unenforceable. B & L contends that the court legally erred in holding it guilty of inequitable conduct because the court found only that B & L acted with gross negligence, not with an intent to deceive. B & L also maintains that, regardless of the fate of the added claims 10–12, original claims 1–9

across said table in the Y-direction orthogonal to said X-direction;

electromechanical X-servo means connected drivably to said carriage; and

electromechanical Y-servo means connected drivably solely to said driving roller means, said bidirectional displacement of said cut chart being the sole provision for relative displacement of said chart and said marking element for recording in said Y-direction.

**2.** Claims 10–12 of the '684 patent are as follows:

10. The X–Y plotter as claimed in claim 1, wherein:

said driving roller means includes a drive roller having a

 peripheral anti-slip surface having a high coefficient of friction frictionally engageable with a surface of said cut chart; and

said pinch roller means includes a pinch roller engageable with the other surface of said cut chart and positioned to hold said cut chart against said drive roller.

11. The X–Y plotter as claimed in claim 10, wherein the anti-slip surface of said drive roller is knurled.

12. The X–Y plotter as claimed in claim 11, wherein the anti-slip surface is cylindrical.

cannot, as a matter of law, be held unenforceable absent actual, *"Walker Process"*-type fraud.[3] Such fraud was not alleged, proved, or found. Having disposed of all claims by its decision on the above issues, the district court chose to enter judgment under Federal Rule of Civil Procedure 54(b) without reaching the additional validity questions raised under sections 102, 103, and 112. It denied HP attorney fees, requested under 35 U.S.C. § 285 (1982), a ruling challenged in HP's cross appeal.

### III

### FACTS CONCERNING THE REISSUE AFFIDAVITS

The facts surrounding the two Fleming affidavits submitted by B & L to support the reissue application are central to the issues of validity and enforceability. Accordingly, those facts must be set forth in detail.

Upon acquisition of the '950 patent, B & L immediately began steps to secure its reissue. The matter was handled by Bernard Bogdon, B & L's in-house counsel, and William Hyer, outside patent counsel. Hyer delegated the task to an associate of his firm, Jonathan Jobe. It was Jobe's first experience with drafting a reissue application.

Working from the '950 patent file and the specifics Hyer gave him on the HP plotter, Jobe drafted the reissue application, adding three dependent claims to Claim 1 to cover specific features of the HP plotter. Jobe drafted the declaration, later signed by B & L's vice president, George More, to state that the '950 patent was "partly or wholly inoperative ... by reason of the patentee claiming less than he had a right to claim in that he had a right to claim [his invention] more specifically," and that the omission of the dependent claims was caused "because of oversight and without deceptive intent on the part of said John O. Yeiser or his attor-

ney." No one had at that time consulted with Lawrence Fleming, the patent agent (by then retired) who had prosecuted the '950 patent.[4]

Although he signed the declaration, More knew nothing about the alleged "error," either personally or based on others' investigations. Indeed, he was told that he was better off not asking any questions. Jobe testified that he included the reference to an "oversight" because "it is required by the statute" and because he could not "imagine any deceptive reason for not including those claims."

Filed in due course, the reissue application was rejected on the ground:

> The declaration is insufficient because it does not specify an error. The addition of narrower claims, by itself, is not an error. Note that there is no allegation that base claim 1 is inoperative or invalid. Why are claims of narrower scope necessary? The declaration is further insufficient because it does not specify how the error arose or occurred. The statement that the alleged errors occurred or arose because of oversight on the part of the inventor or his attorney does not specify in detail how and why such an oversight occurred. A declaration from the original attorney may be in order.

Following the examiner's rejection, Jobe made his first contact with Fleming, by telephone, informing him generally of the nature of the reissue application and of the PTO rejection and asking how Fleming's alleged "oversight" occurred. In essence, per the district court, Jobe asked Fleming how he could have made the "tremendous blunder" of omitting claims specifically encompassing features of the pinch roller assembly. *Hewlett–Packard*, 692 F.Supp. at 1140, 8 USPQ2d at 1198. Fleming attempted to justify his action with the explanation, later confirmed by letter, that he was unable to get much information from Yeiser.

---

**3.** *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).

**4.** Yeiser, the inventor, had been deceased for a number of years.

Jobe then prepared an affidavit for Fleming, which was submitted to the PTO. Essentially, Fleming averred that he had only limited contacts and ability to communicate with the inventor; that no one at the company where Fleming was employed, or its predecessor, provided any substantive help or guidance during prosecution of the patent application; that Yeiser sent him a single, brief memorandum to guide him on what to claim; and that claims which further define and distinguish the invention from the prior art could have been drafted and allowed had further communications and guidance been received. Although Fleming had made references to his "old file" in discussing matters with Jobe, Jobe never asked for documentation or otherwise sought confirmation of Fleming's averments.

The PTO maintained its rejection of B & L's reissue application despite the first Fleming affidavit, reiterating the same grounds as in its initial rejection. Specifically, the PTO found that the More declaration and the Fleming affidavit failed to specify an error or how, when, and why the alleged error arose. Particularly addressing Fleming's affidavit, the examiner stated:

> The Fleming affidavit states that the contacts and ability to communicate with the inventor by the agent who prepared the application were significantly limited. It is acceptable on this point. It is not acceptable however as to how and by whom the scope of the subject matter claimed was determined and why.

At this point, house counsel Howard Robbins took over prosecution of the reissue. After speaking with Fleming, Robbins drafted the second Fleming affidavit. In that affidavit, Fleming averred that he had been given a "crude model of the invention" to review on only one occasion for about two hours; that the scope of the claims was determined solely by him based on this brief disclosure; that he had no discussions with Yeiser concerning the scope of the claims; and that Yeiser had sold his plotter business and was not focusing on such matters. Robbins' accompanying argument to the PTO reiterated these

"facts" and that Fleming's action was "without full cognizance of what was significant in view of the art." The PTO reconsidered the original declaration, together with the two Fleming affidavits, and found them sufficient under 37 C.F.R. § 1.175. Accordingly, the PTO allowed claims 1–12 in reissue patent '684.

During discovery in this lawsuit, HP obtained notebooks which Fleming had kept from 1970–73. Those notebooks detailed Fleming's daily activities, including efforts relating to the '950 application. The entries contradicted crucial parts of the two Fleming affidavits submitted to the PTO and prompted HP to raise the affirmative defense of inequitable conduct during prosecution of the reissue.

Fleming's notebooks and other evidence established, and it is not disputed, that contrary to Fleming's averments that he and Yeiser had "limited," "infrequent" contacts during the period of preparation and prosecution of the '950 patent, the two men had met in person, spoken on the telephone, or exchanged correspondence many (67) times in that time frame. Contrary to Fleming's averment that the single memorandum from Yeiser was his "only guidance" on what to claim, the two met to review the patent application and discussed prior art as well as claim strategies. As the district court pointedly summed up the situation:

> All these contacts contradict and destroy the validity of Fleming's statement regarding his contacts with Yeiser and [Fleming's] wholly unaided hand in fashioning the scope of the claims.

*Id.* at 1128, 8 USPQ2d at 1188. In addition, Fleming in fact had numerous recorded contacts (53) with Tarrantino, president of the inventor's employer. His communications with the clients were never "cut off". The second affidavit, like the first, contains blatant misstatements.

The record is unchallenged that the scenario B & L presented to the PTO, that Fleming misunderstood the invention and did the best he could on his own to draft the claims, contained not merely technical

misstatements, but pure fiction. Moreover, Fleming's own handwritten notes show that he had discovered his notebooks and consulted them before the PTO issued the '684 patent. The letter to Jobe from Fleming in which Fleming referenced his notebooks negates B & L's basic position during trial that neither B & L nor Fleming knew the notebooks existed until after this litigation began.

Other details of the prosecution of the reissue application appear in the district court's opinions. The above recount, however, gives the flavor of the factual basis for the district court's holdings of invalidity and unenforceability.

## IV

### INEQUITABLE CONDUCT

We address the issue of inequitable conduct first because, if affirmed, it would be dispositive. B & L's appeal raises the question of whether the district court resolved the matter of inequitable conduct under the correct legal standard. More particularly, B & L argues that the district court found only gross negligence in its conduct, which is insufficient, as a matter of law, to sustain the court's ruling.[5]

From a close reading of the district court's rulings, we conclude that the court misunderstood our precedent with respect to the correct legal standard for resolving the issue of inequitable conduct. The district court did not have the benefit of the recent clarification by this court in *Kingsdown*, which explained that a finding of gross negligence in itself is insufficient to support a holding of inequitable conduct. *Kingsdown*, 863 F.2d at 876–77, 9 USPQ2d at 1392.

Inequitable conduct requires a finding of an intent to mislead or deceive the PTO. Such intent usually can only be found as a matter of inference from circumstantial evidence. *See, e.g., Klein v. Peterson*, 866 F.2d 412, 415, 9 USPQ2d

1558, 1560 (Fed.Cir.) ("circumstantial evidence may permit an inference of intent"), *cert. denied,* —— U.S. ——, 109 S.Ct. 2432, 104 L.Ed.2d 989 (1989). Although the proof of gross negligence may be circumstantial evidence which gives rise to an inference of intent to mislead in some instances, the label "gross negligence" covers too wide a range of culpable conduct to create such an inference in all cases. Thus, grossly negligent conduct may or may not compel an inference of an intent to mislead. Such an inference depends upon the totality of the circumstances, including the nature and level of culpability of the conduct and the absence or presence of affirmative evidence of good faith. *See Kingsdown*, 863 F.2d at 876, 9 USPQ2d at 1392.

Although the district court here characterized B & L's conduct as evidencing a "[s]tudied ignorance" of the facts and a "reckless indifference" to the truth, and further noted the complete absence of evidence of good faith (circumstances we have held may give rise to an inference of wrongful intent, *see FMC Corp. v. Hennessy Indus., Inc.*, 836 F.2d 521, 526 n. 6, 5 USPQ2d 1272, 1275 n. 6 (Fed.Cir.1987)), the district court did not actually make a finding that B & L intended to mislead the PTO. Relying on earlier precedent of this court, *e.g., J.P. Stevens Co. v. Lex Tex, Ltd.*, 747 F.2d 1553, 1560, 223 USPQ 1089, 1092 (Fed.Cir.1984), the district court apparently understood that it was unnecessary to go beyond a finding of gross negligence. That understanding was legal error. A finding of intent to mislead is necessary.

The Supreme Court in *Pullman–Standard v. Swint*, 456 U.S. 273, 291, 102 S.Ct. 1781, 1791, 72 L.Ed.2d 66, (1982) has instructed:

"When an appellate court discerns that a district court has failed to make a finding because of an erroneous view of the law, the usual rule is that there should be a

---

**5.** Although B & L also argues that it was not grossly negligent, we are unpersuaded that the explicit finding of the court to the contrary is clearly erroneous. Moreover, we agree with the

court that the mistakes in the affidavits were material in that "but for" those misrepresentations, the PTO would not have granted the reissue application.

remand for further proceedings to permit the trial court to make the missing findings, ..."

In accordance with that general rule, we vacate the court's judgment on inequitable conduct and remand for the district court to provide the "missing finding" of intent or no intent and to enter a new judgment on the issue of inequitable conduct.[6]

■ In this connection, we reject B & L's argument that a finding of actual fraud must be made to render the claims (1–9) carried over from the original patent unenforceable. Although B & L is correct that an extremely high level of misconduct, actual fraud, is necessary to sustain a *Walker Process* antitrust claim, that argument misses the mark. *See In re Clark*, 522 F.2d 623, 628, 187 USPQ 209, 213 (CCPA 1975) (although the proved misconduct was not fraud under *Walker Process*, it was inequitable and sufficient to reject all claims in reissue application). When a party seeks to collect monetary damages from a patentee because of alleged violations of the antitrust laws, it is appropriate to require a higher degree of misconduct for that damage award than when a party asserts only a defense against an infringement claim. *See Argus Chem. Corp. v. Fibre Glass–Evercoat Co.*, 812 F.2d 1381, 1386–87, 1 USPQ2d 1971, 1975–76 (Fed.Cir. 1987) (Nies, J., filing additional views); *accord Jackson Jordan, Inc. v. Plasser Am. Corp.*, 219 USPQ 922, 933–34 (E.D.Va. 1983), *aff'd in pertinent part, rev'd in part, vacated in part*, 747 F.2d 1567, 224 USPQ 1 (Fed.Cir.1984). A successful defense of inequitable conduct during reissue is not comparable to asserting a *Walker Process* claim against a patentee.

■ Moreover, in *Kingsdown*, we reaffirmed that, when inequitable conduct is found, all claims of the patent are rendered unenforceable, not merely those claims directly affected by the misconduct. *Kingsdown*, 863 F.2d at 877, 9 USPQ2d at 1392. We are unpersuaded that a different consequence should follow when the inequitable conduct occurs during reissue proceedings rather than during original prosecution. *Accord Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579, 594, 171 USPQ 650, 662 (7th Cir.1971) (finding inequitable conduct during reissue, held that "the facts call for nothing less than a complete denial of enforceability of *any* of the claims acquired by reissue") (emphasis added), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972).

■ Reissue is essentially a reprosecution of all claims. For example, original claims which a patentee wants to maintain unchanged may nevertheless be rejected on any statutory ground. *See* 35 U.S.C. § 251 ("[t]he provisions of this title relating to applications for patent shall be applicable to applications for reissue of a patent"); 37 C.F.R. § 1.176 (1988) (reissue application "examined in the same manner as original applications"); *In re Doyle*, 482 F.2d 1385, 1392, 179 USPQ 227, 232–33 (CCPA 1973) (original claims held invalid under section 112 during reissue), *cert. denied*, 416 U.S. 935, 94 S.Ct. 1933, 40 L.Ed.2d 286 (1974); United States Patent & Trademark Office, *Manual of Patent Examining Procedure* § 1440 (5th ed. 1983 & 1987 rev. 6) (an original claim "will be fully examined in the same manner subject to the same rules relating thereto, as if being presented for the first time in an original application"). In sum, we conclude that, with respect to inequitable conduct, it is appropriate to give the same extent of unenforceability to a reissue patent as to an original patent and that the same level of misconduct is required in both instances.[7] Thus, if the

---

**6.** HP cross appeals from the denial of its request for an award of attorney fees under 35 U.S.C. § 285 (1982), claiming the court's inequitable conduct holding entitled it to such an award. Our precedent does not support HP's position. An award of attorney fees does not follow automatically from a holding of inequitable conduct. *See, e.g., Reactive Metals & Alloys Corp. v. ESM, Inc.*, 769 F.2d 1578, 1582, 226 USPQ 821, 824 (Fed.Cir.1985) ("even though inequitable conduct before the PTO is found, fees may be refused"). In any event, that holding having been vacated, HP's appeal is rendered moot.

**7.** It is well settled that, in the reverse case of inequitable conduct during prosecution of the original application, reissue is not available to obtain new claims and thereby rehabilitate the patent. *See, e.g., In re Clark*, 522 F.2d 623, 627, 187 USPQ 209, 213 (CCPA 1975) (reissue un-

district court concludes, on remand, that the record establishes inequitable conduct, all claims are rendered unenforceable.

## V

### VALIDITY

A. *Reissue Claims 10–12 Are Invalid*

Even before specific provisions were included in the patent statute for correcting defective patents, Chief Justice Marshall, in *Grant v. Raymond*, 31 U.S. (6 Pet.) 218, 244, 8 L.Ed. 376 (1832), articulated the principle that a defective patent was an inadequate exchange for the patentee's disclosure of an invention and that a new patent should be issued, in appropriate circumstances, which secures to the patentee the benefits which the law intended. The circumstances under which reissue is permissible are now set forth in 35 U.S.C. § 251, which provides in pertinent part:

> Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue.

B & L argues that an "error" is present, within the meaning of section 251, if it can be discerned from the patent specification, claims, and prosecution history that the patentee could have included a narrower claim, unless there is evidence that such "omission" was intentional. The omission of narrower claims 10–12, per B & L, also falls within the statutory language that the patentee claimed "less than he had a right to claim."

available to rescue patentee who committed in-

The district court found that the facts in the Fleming affidavits were essential to reissue and that without those facts, which turned out to be "grossly inaccurate," there was no error warranting reissue. Conversely, B & L asserts that More's original declaration established "reissuable error" and that the Fleming affidavits were both unnecessary and wrong only in immaterial details. Our precedent rejects B & L's simplistic interpretation of the reissue statute with respect to what constitutes error under section 251.

■ As explained in *In re Wilder*, 736 F.2d 1516, 222 USPQ 369 (Fed.Cir.1984), *cert. denied*, 469 U.S. 1209, 105 S.Ct. 1173, 84 L.Ed.2d 323 (1985):

> There are two distinct statutory requirements that a reissue oath or declaration must satisfy. First, it must state that the patent is defective or partly inoperative or invalid because of defects in the specification or drawing, or because the patentee has claimed more or less than he is entitled to. Second, the applicant must allege that the defective, inoperative, or invalid patent arose through error without deceptive intent.

*Id.* at 1518, 222 USPQ at 370; *see also In re Wesseler*, 54 C.C.P.A. 735, 367 F.2d 838, 847–48, 151 USPQ 339, 346–47 (1966). In sum, the statutorily required "error" of section 251 has two parts: (1) error in the patent, and (2) error in conduct. *See In re Clark*, 522 F.2d at 626, 187 USPQ at 212.

On the first part, the precedent of this court is that the expression "less than he had a right to claim" generally refers to the scope of a claim. *See, e.g., In re Wesseler*, 367 F.2d at 847, 151 USPQ at 346 (patentee claimed "less than he had right to claim" and sought "reissue to enlarge the *scope* of the patent claims"); *In re Handel*, 50 C.C.P.A. 918, 312 F.2d 943, 945–46 n. 2, 136 USPQ 460, 462 n. 2 (1963) (statutory sense of "less" is subject matter included within the claims). Thus, that provision covers the situation where the claims in the patent are narrower than the prior art would have required the patentee to claim and the patentee seeks broader claims.

equitable conduct during original prosecution).

Conversely, the alternative that the patentee claimed "more ... than he had a right to claim" comes into play where a claim is too broad in scope in view of the prior art or the specification and the patentee seeks narrower claims.

In this case, B & L averred that the inventor claimed "less" than he had a right to claim, which ordinarily would mean that B & L sought broader claims by reissue. But B & L did not seek broader claims; instead, B & L sought to add several dependent claims in hopes that it could assert the patent should independent claim 1 be held invalid. Otherwise, the dependent claims add nothing to the patent's protection against infringements. Any device that infringes new claims 10–12 *ipso facto* infringes carry-over claim 1, which B & L maintains is valid. Thus, in fact, B & L is not asserting that the claims in the '684 patent are inoperative (i.e., ineffective to protect the invention) by reason of the patentee claiming either too much or too little in scope, but because he included, in a sense, *too few* claims. *See In re Handel,* 312 F.2d at 945–46 n. 2, 136 USPQ at 462 n. 2.

■ Although neither "more" nor "less" in the sense of scope of the claims, the practice of allowing reissue for the purpose of including narrower claims as a hedge against the possible invalidation of a broad claim has been tacitly approved, at least in dicta, in our precedent. *Id. See also* 4 E. Lipscomb, *Walker on Patents* § 14:33 at 479 (3d ed. 1986). For purposes of this case, we will assume that that practice is in accordance with the remedial purpose of the statute, although B & L clearly did not allege an "error" in the patent which meets the literal language of the statute. We need not decide here whether omission of narrow claims which more specifically cover a broadly claimed invention meets the first prong of the requirement for error, that is, error in the patent, because B & L clearly did not establish the second prong, namely, inadvertent error in conduct. Contrary to B & L's position, a reissue applicant does not make a *prima facie* case of error in conduct merely by submitting a sworn statement which parrots the statutory language.

The language of the current statute, "error without deceptive intent," replaced, but did not substantively change, the language of the prior statute, section 4916 of the Revised Statutes, 35 U.S.C. § 64 (1946), "error ... by inadvertence, accident, or mistake, and without fraudulent or deceptive intent." The term "error" encompasses "inadvertence, accident or mistake," and those words were eliminated as redundant. *See* 4 Lipscomb, *supra,* § 14.10 at 411. As explained in *Ball Corp. v. United States,* 729 F.2d 1429, 1435 & n. 9, 221 USPQ 289, 294 & n. 9 (Fed.Cir.1984):

> The 1952 revision of the patent laws made no substantive change in the definition of error under section 251.... 'Error' is interpreted in the same manner as under section 64 of the old law, i.e., accident, inadvertence, or mistake.

The statutory provision has been implemented and expanded by the PTO regulations of 37 C.F.R. § 1.175, which require an oath or declaration with respect to both aspects of error under section 251 and further require an explanation as to how and when the error in conduct arose and how and when it was discovered.

B & L asserts the theory that, whenever it is apparent that narrower claims could have been obtained, error warranting reissue exists. Under B & L's theory, the dual error inquiry collapses into one because the omission of additional narrow claims not only makes the patent "defective," but also gives rise to an inference of "oversight". Were that theory correct, it is difficult to conceive of any extant patent for which a right of reissue would not exist, a view which this court has unequivocally and repeatedly rejected. For example, as explained in *In re Weiler,* 790 F.2d 1576, 229 USPQ 673 (Fed.Cir.1986), reissue is not intended to give the patentee simply a second chance to prosecute the patent application:

> The reissue statute was not enacted as a panacea for all patent prosecution problems, nor as a grant to the patentee of a second opportunity to prosecute *de novo* his original application.

*Id.* at 1582, 229 USPQ at 677. *Weiler* further advises:

> [T]he grant of reissues [is not required] on anything and everything mentioned in a disclosure.... [Section] 251 does not authorize a patentee to re-present his application. Insight resulting from hindsight on the part of new counsel does not, in every case, establish error.

*Id.* at 1583 n. 4, 229 USPQ at 677–78 n. 4.

B & L seeks to avoid the admonitions of *Weiler* with an argument, in effect, that an error in conduct must be presumed, absent affirmative evidence that the defect in the patent which is asserted in the reissue application was intentional. For this premise, B & L relies on language in *Ball* stating that reissue was there appropriate because "there is no evidence that the [patentee] intentionally omitted or abandoned the claimed subject matter". 729 F.2d at 1435–36, 221 USPQ at 294. In *Ball*, that analysis was *apropos;* it is not germane here. The patentee in *Ball* was seeking broader claims and an abandonment inquiry was necessary under the facts presented. B & L does not suggest circumstances which would constitute abandonment of the subject matter of the dependent claims while not, at the same time, abandoning the subject matter of the independent claim. Thus, B & L's proposed restriction on reissue where narrower claims are sought is, in truth, no restriction at all.

■ Returning to the district court's holdings, we discern no legal error in its conclusion that the original More declaration in itself was inadequate to establish error and that the supplemental Fleming affidavits were necessary. The Fleming affidavits were critical to provide the required explanation of what *his* error was and how and why it occurred.

The evidence of record establishes beyond doubt that Fleming's affidavits, in explaining why narrow claims were not included, were factually untrue. We need not repeat those errors, which are set out above and are substantially undisputed. B & L argues that the misstatements were innocent and should be ignored. Assuming that they were due only to Fleming's faulty

memory, the misstatements are not thereby corrected to provide a valid assertion of error. Accordingly, the district court properly held that the factual inaccuracy of the affidavits eliminated the basis for reissue and rendered the '684 patent invalid, albeit only as to claims 10–12.

### B. *"Carry–Over" Claims 1–9 Remain Valid*

■ Only claims 10–12 were added by B & L during prosecution of the reissue application. Aside from correction of a typographical error in claim 3, the original claims 1–9 of the '950 patent remained identical. HP contends that the effect of the court's holding that B & L failed to submit a valid reissue application is to render the '684 patent invalid in its entirety, that is, all claims must be held invalid. The district court noted that there was some illogic in invalidating the reissue patent and, at the same time, upholding the carry-over claims therein. The carry-over claims cannot be asserted based on the original patent, because the patent owner must surrender the original patent upon reissuance. 35 U.S.C. § 252 (1982). Logically, it would follow that B & L has no claims to enforce. Indeed, some precedent exists to support invalidation of all claims when the reissue declaration is found wanting. *See, e.g., Riley v. Broadway–Hale Stores, Inc.*, 114 F.Supp. 884, 98 USPQ 433 (S.D.Cal.1953), *aff'd*, 217 F.2d 530, 103 USPQ 414 (9th Cir.1954). We agree with the district court, however, that such a result is neither compelled by the patent statute nor by the circumstances here.

■ There is no disagreement with the long-standing proposition that invalidation of a new claim (added during reissue) on prior art does not invalidate the other claims. *Accord Cleveland Trust Co. v. Thomas*, 1 F.Supp. 917, 920 (D.Mass.1932) ("It is settled law that the invalidity of a new claim in a reissue does not impair the validity of original claims repeated in the reissue"). Nor could there be any disagreement, for the patent statute provides: "Whenever, without any deceptive intention, a claim of a patent is invalid the

remaining claims shall not thereby be rendered invalid." 35 U.S.C. § 253 (1982). That proposition offers little guidance, however, because the invalidity resulting from a defective reissue application may be viewed as affecting the entire patent and not merely any particular claim.

We find support for upholding carry-over claims in *Gage v. Herring*, 107 U.S. 640, 27 L.Ed. 601 (1883). There, the Supreme Court expressed its view that the inadequacy of the ground for reissuing a patent did not "impair the validity of the original claim which is repeated and separately stated in the reissued patent." *Id.* at 646. *Gage* is especially on point because the invalidity of the reissue claim did not turn on prior art but on the negation of a right to reissue. The patentee repeated one claim from his original patent and attempted to add a second claim by reissue, arguing that the original claim was "too much restricted." The Supreme Court held the added claim invalid because that claim was one the patentee "did not make, or suggest the possibility of, in the original patent." *Id.* Nevertheless, the Court upheld the validity of the original claim. *See also Foxboro Co. v. Taylor Instrument Cos.*, 157 F.2d 226, 228, 70 USPQ 338, 340 (2d Cir.1946) (Hand, J.) ("we need not consider whether [the patentee] showed adequate excuse for any reissue whatever, because, even though he did not, the surrender of the original patent, resulting from the acceptance of the reissue, did not invalidate any claims which he carried over into the reissue"), *cert. denied*, 329 U.S. 800, 67 S.Ct. 494, 91 L.Ed. 684 (1947); *cf. Miller v. Brass Co.*, 104 U.S. 350, 26 L.Ed. 783 (1882) (delay in filing for broadened reissue invalidates new claim only).

We see no reason to reach a contrary result under the circumstances here. Accordingly, we affirm the district court's ruling that the lack of error warranting reissue invalidates only new claims 10–12, and not original claims 1–9.

---

**8.** A motion to vacate a judgment based on disqualification of a trial judge is a matter unrelated to patent law. Accordingly, we follow the law of the regional circuit in which the district court sits, here the Ninth Circuit. *Polar-*

## VI

## DISQUALIFICATION

Following entry of judgment, B & L brought a motion to disqualify the trial judge under 28 U.S.C. § 455(a) (1982). That section provides:

> Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

As grounds for its motion, B & L asserted that HP's employment of the judge's son would cause a reasonable person to question the judge's impartiality. It appeals the denial of that motion. *See* 8 USPQ2d 1206.

 A motion for disqualification raises a delicate matter of constitutional dimensions. As the Supreme Court has stated:

> The Due Process Clause "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way, 'justice must satisfy the appearance of justice.'"

*Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 108 S.Ct. 2194, 2205 n. 12, 100 L.Ed.2d 855 (1988) (quoting *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825, 106 S.Ct. 1580, 1587, 89 L.Ed.2d 823 (1986)). The decision on such a motion is left, in the first instance, to the trial court's discretion. The Ninth Circuit Court of Appeals then reviews the trial court's decision under an abuse of discretion standard.[8] *See, e.g., United States v. Monaco*, 852 F.2d 1143, 1147 (9th Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 864, 102 L.Ed.2d 988 (1989). Under that standard, we must ask not whether we would have decided as did the trial court, but whether its decision represents "a clear error of judgment."

*oid Corp. v. Eastman Kodak Co.*, 867 F.2d 1415, 1419 n. 11, 9 USPQ2d 1877, 1880 n. 11 (Fed. Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 1956, 104 L.Ed.2d 425 (1989).

*Zepeda v. I.N.S.,* 753 F.2d 719, 725 (9th Cir.1983).

In enacting section 455(a), Congress created an objective standard under which disqualification of a judge is required when a reasonable person, knowing *all* the facts, would question the judge's impartiality. *Liljeberg,* 108 S.Ct. at 2201 n. 7; *United States v. Nelson,* 718 F.2d 315, 321 (9th Cir.1983) ("The test for disqualification under section 455(a) is an objective one: whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned."); 13A C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure: Jurisdiction* § 3549 at 612 (1984). Although that standard is a relatively vague and flexible ground upon which to decide a question of constitutional import, the Supreme Court has provided a starting point for applying it: "it is critically important ... to identify the facts that might reasonably cause an objective observer to question [the judge's] impartiality." *Liljeberg,* 108 S.Ct. at 2205.

B & L asserts a number of "facts" which it claims require disqualification: (1) HP has employed the judge's son for the past fifteen years and such employment continued throughout and following the lawsuit; (2) the judge (allegedly) "concealed" the son's employment relationship with HP; (3) HP's own employee raised a concern about the relationship; (4) articles appeared in various newspapers questioning the judge's impartiality in view of the relationship; (5) HP only recently disclosed the employment relationship to B & L; (6) the litigation is of "enormous" significance to HP; (7) HP "thwarted" B & L's attempts to learn the details of the employment relationship; and (8) HP (allegedly) filed suit specifically because it was likely the parent of an employee would preside.

As an initial matter, B & L's asserted "facts" pertaining to how HP handled the litigation are not attributable to the judge and, thus, are irrelevant to the merits of disqualification. *See United States v. Wolfson,* 558 F.2d 59, 62 (2d Cir.1977) (party's conduct during litigation only establishes party's feelings toward judge, not the reverse required under section 455); *accord Sheet Metal Workers Int'l Ass'n Local Union No. 162 v. B.J. Heating & Air Conditioning,* 695 F.Supp. 485, 487 (E.D.Cal.1987) (contention under section 455(a) that conduct of party in proffering evidence during litigation caused court to lose appearance of impartiality denied as "absurd" and "simply devoid of any merit whatsoever"). Accordingly, the final four items listed above do not further B & L's motion.

We now turn to address whether the four pertinent items above, when considered together with the additional facts of record, render the trial court's non-recusal decision a clear error of judgment. B & L asserts that courts have treated the fact that a judge's offspring is employed by a litigant "virtually as if it were a *per se* basis for disqualification." Our reading of the cases does not support that assertion. *See, e.g., In re Fox West Coast Theatres,* 88 F.2d 212, 226 (9th Cir.) (even if judge's son were employed by bankrupt, that fact would not disqualify judge from hearing bankruptcy proceedings), *cert. denied,* 301 U.S. 710, 57 S.Ct. 944, 81 L.Ed. 1363 (1937). *Cf. United States v. Equifax, Inc.,* 557 F.2d 456, 463–64 (5th Cir.1977) (section 455(a) did not require recusal when judge's son was associate of law firm representing defendant), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978); *Voltmann v. United Fruit Co.,* 147 F.2d 514, 517 (2d Cir.1945) (no disqualification though judge's son-in-law member of firm representing defendant).

In refusing to require disqualification where the trial judge's son had represented one of the litigants in a separate transaction, the Seventh Circuit Court of Appeals recently stated:

The risk to the impartiality of the judge is too small, and the risk of manipulation by litigants too large, to treat parent and child as one. A judge who cannot be expected to remain impartial through trivial matters such as this should not be sitting even when his family is unaffected.

*In re National Union Fire Ins. Co.*, 839 F.2d 1226, 1230 (7th Cir.1988). We do not mean to imply that employment by a litigant of a judge's offspring does not raise a serious question of impartiality. It is merely one factor to consider, however, and does not alone mandate disqualification.

Here, other facts mollify the situation. The HP plant, which employs the son, is not involved with X–Y plotters. He is employed as a Materials Handling Supervisor, a non-management position without a policymaking role, as one of 83,000 HP employees. The record indicates that a judgment adverse to HP in this case will neither affect the son's employment status nor his financial interest (he participates, as all HP employees with six month's continuous employment automatically do, in HP's profit sharing plan) in the company.

Moreover, contrary to B & L's understanding, the trial judge was not required to disclose to B & L that the son was employed by HP. Counsels' approval to preside was unnecessary. Indeed, some authorities indicate that seeking such approval is inappropriate, reasoning:

> [A] federal judge should reach his own determination as to whether he should recuse himself from a particular case, without calling upon counsel to express their views as to the desirability of his remaining in the case. The too frequent practice of advising counsel of a possible conflict, and asking counsel to indicate their approval of a judge's remaining in a particular case is fraught with potential coercive elements which make this practice undesirable.

Resolution L of The Judicial Conference of the United States, *Interest in Litigation* (adopted Oct. 1971). *See also National Union*, 839 F.2d at 1231 ("Judges should refrain from asking for the views of counsel on these questions.") (citing Resolution L).

The fact that an HP employee felt impelled, at an HP meeting, to offer his knowledge that HP employed the judge's son also does not mandate reversal. The standard is what a reasonable person would believe in view of *all* the facts. The record fails to show that the employee knew any facts beyond the existence of an employment relationship. Such a relationship raises the question, but provides no answer. *See In re City of Detroit*, 828 F.2d 1160, 1168 (6th Cir.1987) (affidavit of five people asserting belief judge's impartiality might reasonably be questioned not "legally sufficient" to require disqualification).

B & L points out that the press questioned the trial judge's non-recusal in this case in several articles. Such articles provide, per B & L, actual evidence that reasonable observers *did* question the court's impartiality. Without anything in the record to establish how those articles came to be written, however, they are not persuasive of B & L's premise. *See, e.g., In re City of Detroit*, 828 F.2d at 1168 ("articles cited by the city do not necessarily mean that the *public* believes [the] Judge ... is biased") (emphasis added); *In re United States*, 666 F.2d 690, 695 (1st Cir.1981) ("to the extent that the doubts were created by representations of the press shown to be not grounded in fact, they cannot require disqualification").

Finally, the record indicates that, in a separate case between the same parties recently concluded *before* the present litigation, the trial judge ruled *for B & L*, and *against HP*. Further, the judge has recused from several cases involving other litigants when persuasive reasons required that action.

Accordingly, we affirm the denial of B & L's motion to vacate the judgment.

## VII

## CONCLUSION

In sum, the district court's orders from which B & L appeals are affirmed in all respects except that portion of its order holding B & L guilty of inequitable conduct before the PTO and its '684 patent consequently unenforceable. We vacate that portion of the court's order and remand for it to reconsider the issue of intent. In view of the remand, the court's order denying

HP attorney fees, from which HP appeals, is moot. Accordingly, that order is also vacated.

### COSTS

Each party shall bear its own costs.

AFFIRMED–IN–PART, VACATED–IN–PART, AND REMANDED.