DATAGATE, INC., a corporation,
Plaintiff–Appellant,

v.

HEWLETT–PACKARD CO., a corporation, Defendant–Appellee.

No. 88–15293.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 3, 1989.

Submission Deferred Nov. 22, 1989.

Resubmitted July 30, 1991.

Decided Aug. 7, 1991.

---

Craig S. Ritchey and Karen E. Wentzel, Blase, Valentine & Klein, Palo Alto, Cal., for plaintiff-appellant.

Kurt W. Melchior, Nossaman, Guthner, Knox & Elliott, San Francisco, Cal., S.T. Jack Brigham, III and Marcia Howe Adams, Palo Alto, Cal., and Robert A. Skitol, Pepper, Hamilton & Scheetz, Washington, D.C., for defendant-appellee.

Before GOODWIN, SCHROEDER and BEEZER, Circuit Judges.

BEEZER, Circuit Judge:

Datagate, Inc. ("Datagate") appeals the district court's order granting summary judgment for defendant Hewlett–Packard Company ("HP") and denying Datagate's motion for disqualification of the district judge in an underlying action in which Datagate brought claims against HP for violation of the Sherman Antitrust Act. We reverse the district court's judgment with respect to Datagate's claim for injunctive relief and remand for a determination of whether Datagate has shown a "threatened loss or damage by a violation of the antitrust laws." We also reverse and remand with respect to the dismissal of Datagate's pleading of an illegal tie-in. We affirm the district court's judgment on all other counts.

## I

Datagate is one of approximately ten independent service organizations ("ISOs") that provide service and repair for Hewlett–Packard computer hardware. In addition to manufacturing and selling this equipment, HP also competes with the ISOs for the service and repair business. The parties agree that HP cooperated with the ISOs between 1978, when Datagate was formed, and 1983 by supplying the parts, service, and information required by the ISOs. Datagate alleges, however, that beginning in 1983 HP initiated a plan of unfair competitive practices in violation of section two of the Sherman Antitrust Act. These alleged practices include restricting ISO access to parts, service and information formerly provided by HP, using its new "ISO policy" as a sales tool to dissuade customers from contracting with ISOs, and making disparaging remarks to customers about Datagate.

Datagate filed suit on January 10, 1986 seeking treble damages under section four of the Clayton Act based on HP's alleged violation of section two of the Sherman Antitrust Act for monopolization and attempted monopolization, as well as use of an illegal tie-in. Additionally, Datagate sought injunctive relief under section 16 of the Clayton Act, and other relief pursuant to its pendent state law claims.

On September 22, 1986, the district court dismissed Datagate's illegal tie-in claim on the grounds that Datagate failed to allege sufficient facts to show "coercion" or injury to competition. On August 31, 1987, the court granted partial summary judgment on the Sherman Act section two claims, ruling that Datagate failed to raise a triable issue of fact as to whether HP's conduct had harmed competition by injuring existing ISOs. However, the court further ruled that there were triable issues of fact regarding the definition of the relevant market and injury to competition due to the chilling effect of HP's conduct on potential competition from new entrants into the ISO market. The parties each filed motions for reconsideration of the summary judgment ruling. In support of its motion, Datagate

submitted evidence of injury to existing competition resulting from HP's change in its "four-hour response" service policy as of August 1, 1987. Under its new policy, HP will no longer provide such service to users who hired ISOs to provide the primary maintenance for their hardware.

The court construed HP's motion for reconsideration as a new motion for summary judgment on antitrust standing grounds. It apparently construed Datagate's as a motion to amend the complaint to add facts relating to HP's new four-hour response service policy. After additional briefing, on July 11, 1988, the district court granted summary judgment to HP on the grounds that as an existing competitor Datagate lacked standing to sue based on injury to potential competition. The court further ruled that, although Datagate had raised a triable issue of fact with respect to injury to competition resulting from HP's new "four-hour response" service policy, it had failed to show any injury to itself as a result of the policy. Therefore, Datagate lacked standing to sue on that issue as well. The district court granted summary judgment against Datagate on all federal antitrust claims, and dismissed all pendant state law claims for lack of subject matter jurisdiction.

Following entry of the judgment, Datagate moved to disqualify Judge Aguilar and set aside the judgment based on his son's employment with HP. On August 11, 1988, the court denied the disqualification motion. Notice of appeal was filed on September 9, 1988.

## II

We review a grant of summary judgment de novo. *Christofferson Dairy, Inc. v. MMM Sales, Inc.*, 849 F.2d 1168, 1171 (9th Cir.1988). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Ashton v. Cory*, 780 F.2d 816, 818 (9th Cir.1986). "Although summary judgment generally is disfavored in antitrust litigation, it is appropriate when

the nonmoving party does not show any issues of material fact and does not present an adequate record to support a finding in his favor." *Christofferson Dairy*, 849 F.2d at 1171.

Section four of the Clayton Act provides in part: "[a]ny person who is injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor...." 15 U.S.C. § 15 (1988). The Supreme Court has interpreted this section to require a showing of antitrust injury. *See, e.g., Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697-98, 50 L.Ed.2d 701 (1977). The Court described antitrust injury as

> injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations ... would be likely to cause.'

*Id.* (quoting *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 125, 89 S.Ct. 1562, 1577-78, 23 L.Ed.2d 129 (1969)). In following *Brunswick*, we have held that

> [§ 4 of the Clayton Act] confers standing to sue only upon those persons causally injured by antitrust violations.... Moreover, in order to prevail the plaintiff must prove not only injury causally linked to the asserted violation, but also that the injury is of the type the antitrust laws were intended to prevent.... Accordingly, the plaintiff must demonstrate that the defendant's conduct was intended to or did have some anticompetitive effect beyond his own loss of business or the market's loss of a competitor.

*Cal. Computer Products v. International Business Machines*, 613 F.2d 727, 732 (9th Cir.1979) (citations omitted). Our recent decision in *Image Technical Service v. Kodak*, 903 F.2d 612 (9th Cir.1990), is not inconsistent. In fact, in that case we noted that "[t]he cases also identify the standing requirement of 'causal antitrust injury.' Kodak does not dispute appellants' stand-

ing to bring its section 2 claim." *Id.* at 619 n. 6.

In *Atlantic Richfield Co. v. USA Petroleum* the Supreme Court recently reiterated its holding that section four requires a showing of antitrust injury and that "[a]ntitrust injury does not arise for purposes of § 4 of the Clayton Act ... until a private party is adversely affected by an *anticompetitive* aspect of the defendant's conduct...." —— U.S. ——, 110 S.Ct. 1884, 1892, 109 L.Ed.2d 333 (1990) (emphasis in original). The Court further emphasized that it has "adhered to this principle *regardless of the type of antitrust claim involved.*" *Id.* (emphasis added).

In *Cal. Computer Products*, we stated that there are "three essential elements to a successful claim of § 2 monopolization:

(a) the possession of monopoly power in the relevant market;

(b) the willful acquisition or maintenance of that power; and

(c) causal 'antitrust' injury."

613 F.2d at 735. The third element is antitrust standing. *See id.* at 736.

■ Datagate failed to demonstrate causal "antitrust" injury and thus failed to meet its burden of establishing standing. Datagate alleged an antitrust injury as a result of HP's disparaging remarks and the use of its ISO policy. According to Datagate, HP's abnormally high service prices and abnormally high profits demonstrate an injury to competition. Datagate offered expert evidence that service prices for HP products are higher than those for comparable IBM and DEC products. However, Datagate failed to show that HP service prices had increased during the period in question. Datagate also argued that HP profits are too high, yet it failed to supply any specific comparative profit figure.

On the other hand, HP supplied evidence showing that the number of ISOs servicing HP hardware actually increased during the relevant period. In fact, the only ISO to go out of business because of lost accounts actually lost its sole client to another ISO that had recently entered the market. Further, total sales for ISOs have continued to increase.

Finally, Datagate's own 1983–1987 Plan provides some explanation for the fewer number and smaller size of ISOs servicing HP products as compared to IBM and DEC products. As the Plan describes:

During the past few years, a number of highly successful maintenance companies have grown up around the IBM and DEC marketplace. The picture is quite different if one looks at HP. The reason for this is simple. Up to ten years ago, HP was involved mainly in the instrumentation field ... Most third party maintenance companies are happy to maintain computer systems, which are based on digital circuitry, but shy away from instrumentation equipment based on analog circuitry.

In its comparisons of the HP service market with that of IBM and DEC products, Datagate now ignores the differences in the maturity of those markets despite its previous recognition.[1] Datagate has thus failed to demonstrate a causal "antitrust" injury in the form of abnormally high prices and profits.

Datagate did raise material issues of fact concerning two other antitrust injuries. However, it failed to show a causal connection between its own injuries and the alleged antitrust injuries. The two antitrust injuries were related to the chilling effect of HP's actions upon new entry by potential competitors and harm to existing competitors resulting from HP's new four-hour response service policy. Datagate was unable to show any injury to itself resulting from either the chilling of new entry or the four-hour response policy.

As an existing competitor, Datagate would have benefited from any chilling of new entry into the market. *See Matsushi-*

---

**1.** HP also attempts to raise the issue of relevant market definition. However, the denial of a motion for summary judgment is generally not appealable. *Simons v. United States*, 497 F.2d 1046 (9th Cir.1976). Further, under similar facts, we recently held that the existence of a separate market for service presented a material issue of fact. *See Image Technical Services, Inc. v. Kodak*, 903 F.2d 612, 615–16 (9th Cir.1990).

*ta Electric Industr. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583, 106 S.Ct. 1348, 1354, 89 L.Ed.2d 538 (1986) (no antitrust injury from alleged conspiracy to charge supra-competitive prices because, while such conduct would violate the Sherman Act, plaintiff-competitors could only gain from it); *Alberta Gas Chemicals Ltd. v. E.I. du Pont de Nemours & Co.*, 826 F.2d 1235, 1243 (3d Cir.1987) (no antitrust injury from competitor's acquisition of a potential entrant because "elimination of a potential increase in output" would "inevitably aid[ ]" existing competitors), *cert. denied*, 486 U.S. 1059, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988). Therefore, Datagate can claim no injury as a result of such chilling.

Further, its attempt to show injury from the four-hour response service policy amounts to a single declaration by Datagate sales manager Carol Ann Riberia that customers "often require the availability of HP four-hour response as a contract term." However, not a single contract produced by Datagate contained such a term. In fact, at least two of its contracts forbid the delegation of work to third parties. Significantly, there is no evidence that Datagate lost any contracts as a result of the new policy.[2]

A final antitrust injury asserted by Datagate is an injury to its ability to compete for new business. Datagate asserts that although the market for the services it was providing was expanding, HP's conduct limited Datagate's ability to compete for that expanding market. Although Datagate's asserted loss of business in the expanding market could constitute an antitrust injury, Datagate has failed to provide sufficient evidence in support of its expanding market theory to survive summary judgment.

■ Finally, Datagate argues that the conduct of HP should be considered as a whole in determining antitrust injury. However, Ninth Circuit caselaw clearly holds that to bring suit under the antitrust laws the "plaintiff's injury must 'reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.' " *Orion Pictures Distribution v. Syufy Enterprises*, 829 F.2d 946, 948 (9th Cir.1987) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697–98, 50 L.Ed.2d 701); *see also Cal. Computer Products v. International Business Machines*, 613 F.2d 727, 732 (9th Cir.1979) (antitrust plaintiff must establish that it has been injured by conduct that has unlawfully harmed competition). Datagate's failure to show injury from a specific violation of the antitrust laws thus precludes its recovery.

Datagate has failed to demonstrate a causal "antitrust" injury. Any injury that Datagate may have suffered as a result of HP's disparaging remarks or its use of its ISO policy does not "reflect ... the effect ... of" nor was it "made possible by" a chilling of new entry or the new four-hour response service policy.

### III

■ Although the district court entered final judgment in favor of HP, it actually failed to consider Datagate's claim for permanent injunctive relief under section 16 of the Clayton Act. In fact, there is absolutely no mention of the claim in the court's final order. Datagate was successful in raising triable issues of fact with regard to the definition of the relevant market, injury to competition, and intent to monopolize with respect to the August 1, 1987 change in HP's four-hour response service policy. Nevertheless, summary judgment was granted HP because of Datagate's failure to show that it has suffered actual injury as a result of the new policy. However, section 16 of the Clayton Act, 15 U.S.C. § 26, "invokes traditional principles of equity and authorizes injunctive relief upon the demonstration of '*threatened* injury.' "

2. Datagate's argument that the district court imposed an improper burden of proof is also without merit. The court clearly acted within the scope of its discretion in refusing to allow Datagate to file a third amended complaint where it had at no time in the two years of litigation established any antitrust injury. *See* Fed. R.Civ.P. 15(a) (After its first amendment, a party may amend again "only by leave of court.").

*Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969) (emphasis added). Because the district court only considered the evidence with regard to actual injury, and did not consider the *threat* of loss or damage to Datagate, we reverse and remand for the trial court to make such findings.

■ To establish a claim for injunctive relief under section 16, Datagate must demonstrate a "cognizable danger" of injury not just a "mere possibility." *TRW, Inc. v. FTC,* 647 F.2d 942, 954 (9th Cir. 1981) (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897–98, 97 L.Ed. 1303 (1953)). The record on appeal indicates that some of Datagate's customers have expressed concern over HP's new policy. While such concern does not show actual injury it may be indicative of a threat of injury. Datagate has also supplied evidence of harm already suffered by other ISOs as a result of the new policy. The district court should consider such evidence in determining whether it is sufficient to raise a triable issue of fact regarding the threat of harm to Datagate.

## IV

■ Datagate did not specify whether it based its tie-in claim on a per se theory or on a rule of reason theory. A claim of a per se violation requires an allegation "that the seller of the tying product 'coerced' to some extent the purchaser into buying the tied product." *Airweld, Inc. v. Airco, Inc.,* 742 F.2d 1184, 1189 (9th Cir.1984), *cert. denied,* 469 U.S. 1213, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985). To state a claim based on the rule of reason, a plaintiff must allege an injury to competition. *See Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 29, 104 S.Ct. 1551, 1567, 80 L.Ed.2d 2 (1984). The district court held that Datagate failed to state a claim under either theory. We disagree.

Fed.R.Civ.P. 8(a), (c) requires only "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the ground upon which it rests. *Conley v. Gibson,* 355

U.S. 41, 47, 78 S.Ct. 99, 102–03, 2 L.Ed.2d 80 (1957). We review de novo a district court's dismissal of an action for failure to state a claim. *Shah v. County of Los Angeles,* 797 F.2d 743, 745 (9th Cir.1986). "In conducting this review, we must assume the correctness of all the factual allegations made by [the plaintiff]." *Id.* Dismissal "is proper only if it is clear that the plaintiff could prove no set of facts within the framework of the complaint that would entitle him to relief. There is no special rule requiring more factual specificity in antitrust pleadings." *Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627 F.2d 919, 924 (9th Cir.1980), *cert. denied,* 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981) (citations omitted). Therefore, the court must determine whether the plaintiff "could show any set of facts, consistent with the allegations of its complaint, that would constitute a violation of the antitrust laws." *Id.*

■ Datagate's allegations are sufficient to meet the liberal requirements of Fed. R.Civ.P. 8(a)(2). Datagate alleged that software and hardware service are separate products, that HP had monopoly power in the software service market, and that it threatened to withhold software service if customers did not also contract for hardware service. Datagate gave specific examples of such threats by HP and stated its belief that there were others. Its allegations may be read as asserting that in at least two cases customers accepted the tied-in hardware service because of these threats. Further, if not enough for a per se claim, it is certainly sufficient to state a claim under the rule of reason. If effectively enforced, such a tie-in would likely have a significant impact on competition in the market for HP hardware service.

## V

Under 28 U.S.C. § 455(a), a judge is required to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The trial court's decision is reviewed under an abuse of discretion standard. *See United States v.*

*Monaco,* 852 F.2d 1143, 1147 (9th Cir.1988), *cert. denied,* 488 U.S. 1040, 109 S.Ct. 864, 102 L.Ed.2d 988 (1989). The trial judge's decision may only be reversed where it represents "a clear error of judgment." *Zepeda v. INS,* 753 F.2d 719, 725 (9th Cir. 1983).

▮ "The test for disqualification under section 455(a) is an objective one: whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *United States v. Nelson,* 718 F.2d 315, 321 (9th Cir.1983). In applying this test "it is critically important ... to identify the facts that might reasonably cause an objective observer to question [the judge's] impartiality." *Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847, 865, 108 S.Ct. 2194, 2205, 100 L.Ed.2d 855 (1988). Datagate argues that in this case the following "facts" require disqualification: (1) HP has employed the judge's son for the past fifteen years; (2) his son has a financial interest in HP's profit sharing plan; (3) the major newspapers in the Bay Area reported the story; (4) the judge failed to disclose his son's employment relationship with HP; and (5) in two other cases the judge has granted summary judgment motions in favor of HP.

However, in a case involving the same facts, the Federal Circuit applying Ninth Circuit law affirmed Judge Aguilar's refusal to disqualify himself. *Hewlett–Packard Co. v. Bausch & Lomb, Inc.,* 882 F.2d 1556 (Fed.Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1125, 107 L.Ed.2d 1031 (1990). As the court noted, an employment relationship between a judge's child and a party to the suit has not generally been held to merit per se disqualification. *Id.; see also In re Fox West Coast Theatres,* 88 F.2d 212, 226 (9th Cir.) (even if judge's son were employed by bankrupt, that fact would not disqualify judge from hearing bankruptcy proceedings), *cert. denied sub nom. Talley v. Fox Film Corp.,* 301 U.S. 710, 57 S.Ct. 944, 81 L.Ed. 1363, *reh'g denied,* 302 U.S. 772, 58 S.Ct. 7, 82 L.Ed. 598 (1937); *cf. United States ex rel. Weinberger v. Equifax, Inc.,* 557 F.2d 456, 463–64 (5th Cir.

1977) (the fact that the judge's son was an associate of the law firm representing defendant did not require recusal where the son did not actively participate in the case), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 768, 54 L.Ed.2d 782, *reh'g denied,* 435 U.S. 918, 98 S.Ct. 1477, 55 L.Ed.2d 511 (1978). Instead, "[i]t is merely one factor to consider...." *Hewlett–Packard,* 882 F.2d at 1569.

▮ Here, as in *Hewlett–Packard Co. v. Bausch & Lomb, Inc.,* "other facts mollify the situation." 882 F.2d at 1569. The district judge's son is one of over 83,000 HP employees. He holds a nonmanagement position in a division that makes calculators, not the large computers involved in this case. Although, like all other HP employees with over six month's continuous employment, he participates in a profit sharing plan, it is reasonable to conclude that the outcome of this litigation will not affect either his employment or his financial interest in the company.

The fact that the judge's decision was reported in the newspapers is not persuasive of a public impression of partiality. *Id.; In re City of Detroit,* 828 F.2d 1160, 1168 (6th Cir.1987) ("articles cited by the City do not necessarily mean that the public believes [the] Judge ... is biased"). Additionally, the trial judge was not required to disclose to Datagate that his son was employed by HP. *Hewlett–Packard,* 882 F.2d at 1569. Section 455(e) and *Liljeberg* are not inconsistent with this position.

Further, the fact that the trial judge has granted summary judgments in favor of HP in other cases is not a basis for disqualification. *See Barnes v. United States,* 241 F.2d 252 (9th Cir.1956). In fact, in at least one other case the judge has ruled against HP. *See Hewlett–Packard,* 882 F.2d at 1569.

▮ Finally, even if the trial judge did abuse his discretion, Datagate waived its right to have the judgment vacated, by failing to move for disqualification in a timely fashion. *United States v. Conforte,* 624 F.2d 869 (9th Cir.), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980); *Ramirez v. United States,* 294 F.2d 277 (9th Cir.1961). HP's counsel informed

counsel for Datagate of the situation by letter dated June 22, 1988, while HP's summary judgment motion was *sub judice.* Nevertheless, Datagate waited six weeks—one month after judgment had been entered—to file its motion.

Neither party shall recover costs.

AFFIRMED in part, REVERSED and REMANDED in part.